### HARRIS COUNTY HOSPITAL DISTRICT, Plaintiff,

v.

### Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

Civ. A. No. H-94-241.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 31, 1994.

---

Arthur E. Murphy, III, Houston, TX, for plaintiff.

Larry C. Marcy, Asst. U.S. Atty., Houston, TX, for defendant.

OPINION ON SUMMARY JUDGMENT

HUGHES, District Judge.

1. *Introduction.*

After slugging it out through three administrative levels of review the parties have reached this court. In one corner is the acknowledged bureaucratic heavyweight champion of the world, The United States' Department of Health and Human Services. In the other corner is the bureaucratic welterweight challenger, the Harris County Hospital District. Two issues are before the court. It is a split decision.

2. *The System.*

The Department of Health and Human Services administers a government program to furnish medical benefits to the elderly. That program is commonly known as Medicare. Medicare is run by the Health Care Financing Administration.

The financing administration has claims managers for Medicare under contract who are fiscal intermediaries. In this case, the agent is Blue Cross/Blue Shield. Blue Cross/Blue Shield subcontracts among its constituent parts; in this case, the sub-agent is Blue Cross/Blue Shield, Texas (Blue Cross). The intermediary's administration of Medicare in Texas is governed by federal statute, the federal regulations of the financing administration, and the rules and guidelines in the financing administration's provider reimbursement manual.

In administering Medicare, the intermediary deals directly with hospitals that receive Medicare benefits on behalf of their patients. In this case the Harris County Hospital District operates two hospitals that accept Medicare patients. It is the intermediary's responsibility to ensure that the district is reimbursed for its Medicare expenses and that the district follows the requirements of the program.

3. *The Procedural History of the Disputes.*

The district requested that Blue Cross:

A. Reimburse it for the allowable bad debts of its indigent patients for fiscal year 1988; and

B. Allow it, for depreciation purposes, to change the useful lives of the two hospitals that it closed in 1989 and 1990.

Blue Cross denied both requests.

The district appealed to the Provider Reimbursement Review Board, and that panel reversed, holding for the district on both issues. The secretary of Health and Human Services conducted the final administrative review, and she reversed the review board, agreeing with Blue Cross' initial decision to deny both claims. The district appealed to court.

4. *Legal Standards.*

■ The parties have filed cross-motions for summary judgment on the administrative record. In a review of executive agency action, this court determines whether that action was "arbitrary, capricious, an abuse of discretion, unsubstantiated by substantial evidence, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The secretary's interpretation of agency regulations is entitled to control, provided that it is not plainly erroneous or inconsistent with the regulation. *Stinson v. United States,* ⎯ U.S. ⎯, ⎯, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). This court's review will be critical and careful. The role of an independent judiciary requires more rigor in its review of the administrative process than a rubber stamp. *See Acadian Gas Pipeline Sys. v. FERC,* 878 F.2d 865, 868 (5th Cir. 1989). If a statute is involved and if the intent of Congress is clear, both the agency and this court must give effect to the unambiguous enacted intent of Congress. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

## A. ALLOWABLE BAD DEBTS

### 5. *Background.*

Like most medical plans, Medicare requires certain deductible and coinsurance amounts to be the responsibility of the patient. *See* 42 C.F.R. §§ 409.80–409.89; 410.152; 410.160. Many patients who receive care at hospitals, however, do not have the funds to pay these amounts and, in fact, never pay the hospitals. Medicare will reimburse the hospitals for these bad debts if they meet the regulatory criteria. *See* 42 C.F.R. § 413.80(e).

For the year at issue and many years earlier, the district used an income test to establish indigence for both its Medicare and non-Medicare patients. It did not inquire about assets. To establish the patient's income the district relied on a patient's statement of indigence as supported by check stubs, social security benefit checks, or a letter from an employer. If a patient had absolutely no income the district accepted the patient's declaration of that fact. After establishing income and dependents, the district divided patients into five groups, ranging from no payment, through three different partial payments, to full payment. The district then issued an eligibility card for its patients with the payment classification. The Medicare patients' eligibility cards issued between 1976 and 1988 had an expiration date of 1999.

Blue Cross accepted the district's indigence determinations for all years before 1988 and reimbursed the district accordingly. In the audits of the district that Blue Cross conducted over those years, not one adjustment had ever been based on the district's policy for determining indigence only on income. From May through July 1987, the Office of Inspector General of Health and Human Services performed audits of intermediaries and hospitals throughout the country and concluded that there were substantial overpayment by Medicare for bad debts. The office of inspector general issued its report in 1988.

The district was one of three providers in Texas to be audited. Prompted by the audit, Blue Cross disallowed the district's bad debt claim in full for fiscal year 1988. The disallowance was based on the district's not using an asset test in addition to income level to determine indigence. Blue Cross did not determine whether patients would not have been indigent if an asset evaluation had been used. It simply denied reimbursement for all Medicare patients because an asset test was not also used. Similar disallowances were made across the country.

### 6. *The Statutory, Regulatory, and Interpretive Scheme.*

Medicare will reimburse a hospital for bad debts if the debt meets these regulatory criteria.

A. The debt must be related to covered services and derived from deductible and coinsurance amounts.

B. The district must be able to establish that reasonable collection efforts were made.

C. The debt must be actually uncollectible when claimed as worthless.

D. Sound business judgment must establish that there was no likelihood of recovery in the future.

42 C.F.R. § 413.80(e). The manual for provider reimbursement review interprets the regulation to allow a hospital to establish that it was reasonable not to try to collect solely by the hospital's establishing that the patient was indigent. The manual has guidelines for determining indigence.

A. The patient's indigence *must* be determined by the provider, not by the patient, i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigence.

B. The provider *should* take into account a patient's total resources, which would include, but are not limited to, an analysis of assets (only those convertible to cash and unnecessary for the patient's daily living), liabilities, income, and expenses. In making this analysis the provider *should* take into account extenuating circumstances that would affect the determination of the patient's indigence.

C. The provider *must* determine that no source other than the patient would be

legally responsible for patient's medical bill, e.g., Title XIX, local welfare agency, and guardian.

D. The patient's file *should* contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination.

Provider Reimbursement Review Manual, HCFA Pub. 15–1, § 312 (emphasis added).

Congress became aware of the move within the department to change the way hospitals accounted for their bad debt. In three successive years congress enacted legislation addressing the issue. In 1987 Congress imposed a moratorium on Health and Human Services's making a change in policy on reimbursements for bad debts.

> In making payments to hospitals under title XVIII of the Social Security Act, the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title (including criteria for what constitutes a reasonable collection effort).

Section 4008(c) of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203 (Dec. 22, 1987).

The following year congress amended the moratorium by adding at the end of the paragraph more specific language.

> including criteria for indigence determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency.

Section 8402 of the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647 (Nov. 10, 1988).

Congress made one more amendment to the statue one year later by adding a sentence to the end of the paragraph.

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigence determina-

tion procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

Section 6023 of the Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239 (Dec. 19, 1989).

This somewhat ungainly combination of manuals, regulations, agency interpretations, and statutes create the tableau through which this court must evaluate the secretary's denial of reimbursement for bad debt.

### 7. *The Moratorium.*

■ At first glance the three-year legislative flurry that created the moratorium tells us two things: (a) the hospital lobby in Washington is persistent and effective and (b) Congress has continually honed its focus to the issue before the court. There can be no doubt that the secretary may not require the district to change the way that it determines indigence if Blue Cross accepted that method of determination before August 1, 1987. *See Hennepin County Medical Ctr. v. Shalala*, No. 3–91–725, MEDICARE & MEDICAID GUIDE (CCH) ¶ 41,948, 1993 WL 546591 (D.Minn. Nov. 2, 1993).

The secretary's arguments to the contrary are specious. She would have us believe that the legislation says that if Blue Cross's approval of the district's methodology for determining indigence is not in accordance with rules in effect before August 1, 1987, then she can make the district change its procedures, and she can refuse to reimburse it for all bad debts.

The secretary's interpretation is wrong. The last sentence (the third legislative act) says that if the intermediary (Blue Cross) has accepted, in accordance with the rules in effect on August 1, 1987, the hospital's bad debt collection policy, the secretary cannot require the hospital to change it. The secretary wants it to say that she cannot force a hospital to change the policy only if the policy is in accord with the rules. If the policy is not, then she can. That would leave

nothing to the moratorium. The phrase "in accordance with the rules in effect on August 1, 1987" modifies "accepted," not "policy."

The secretary's legislative interpretation is worse. One, she would have the court believe that Congress passed a moratorium to say that if, before August 1, 1987, an intermediary determines that an indigent identification policy is allowable, then the secretary cannot make the hospital change that policy, *unless* the intermediary itself was mistaken in making that determination. Not much of a moratorium. That "unless" is not in the legislative language. The dispositive question is whether Blue Cross in fact made a determination before August 1, 1987, that the district's policy for determining indigent status was acceptable.

## 8. *Acceptance.*

■ Of course, it did. For years Blue Cross accepted the district's policy and paid full reimbursements for the claims. Its audits never mentioned the policy that the district used to determine indigence. The secretary's assertion that Blue Cross never sent the district an official determination about its policy is a disingenuous quibble. Actions speak.

The secretary bases her determination on testimony in the administrative record from Blue Cross's expert witness that before August 1, 1987, Blue Cross had neither accepted nor rejected the district's lack of an asset test. This testimony is entirely weightless, an after-the-fact rationalization having no relevance. Blue Cross cannot make years of reimbursement payments confirmed by audits and then say it never really considered and decided whether the lack of an asset test was a problem.

Moreover, the office of inspector general's report indicated that Blue Cross's position was that, while the manual suggests an asset test, it did not believe that hospitals could comply with that requirement on a practical level. Blue Cross was well aware of the asset test provision, and it simply did not require the district to use one for years.

The secretary also asserts that before August 1, 1987, the district had knowledge that the asset test would be required because it knew that the office of the inspector general was going to conduct audits on indigence standards from May through July. The fact that audits on a lack of an asset test were conducted cannot mean that the necessity of an asset test had been made by the intermediary. It is not a coincidence that the moratorium's cut-off is August 1, 1987, after the audits were completed. The audits were the impetous for the denial of reimbursements. The legislative action protected those hospitals whose intermediaries had allowed them to forgo use of an asset test from the requirement, after the audit, to use one. The moratorium applies to the district. The secretary was wrong to deny it reimbursement for its bad debt claims.

## 9. *The Asset Test.*

■ Even if the secretary is correct in asserting that the moratorium does not apply, the court concludes that use of the asset test was not mandatory. The regulations do not contain the asset test, only the manual does. The issuance of the manual was not preceded by the formal rule-making of the administrative procedure act. *See* 5 U.S.C. § 553. The rules in the manual do not have the effect of substantive law or regulation, rather they are interpretive rules. *See Mother Frances Hosp. of Tyler, Texas v. Shalala,* 15 F.3d 423 (5th Cir.1994), *petition for cert. filed* (May 31, 1994), *citing Guernsey Memorial Hosp. v. Secretary of Health and Human Serv.,* 996 F.2d 830 (6th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 1395, 128 L.Ed.2d 69 (1994). Interpretive manuals clarify or explain existing law or regulations; they may set practical processes or serve educational goals, but they cannot be substantive. *See American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987). Administering and legislating are different functions.

■ The manual's provisions for a hospital's determination of indigence relate to the regulatory requirement that the provider must be able to establish that reasonable collection efforts were made. In effect, the manual says that no effort to collect is reasonable when the patient is indigent.

Two of the four guidelines that the manual lists use mandatory language, *must,* and two use precatory language, including the word *should.* The provision suggesting an asset test uses the word *should.*

The secretary goes to heroic efforts to assert that should means must. Her argument fails. *Should* is mandatory only when used as the past tense of *shall.* Otherwise, should is precatory. There are two mandatory provisions: (a) the hospital must determine indigence and (b) the hospital must determine that no other source is legally responsible for a patient's bill. The mandatory nature of these provisions is dictated by the regulations themselves. For example, an interpretive guideline would be inconsistent with the regulation if it asserted that a hospital could abandon reasonable collection efforts without determining indigence.

There is nothing inconsistent with the regulation in suggesting use of an asset test but not requiring it. The court does not need to decide whether requiring an asset test would be inconsistent with the regulation because the manual does not require one. In fact, the regulations state that the hospital is to use its "sound business judgment" in establishing that there was no likelihood of recovery. Everything in the administrative record establishes that the use of an asset test would not materially change the number of patients in the indigent category.

Since the secretary did not require an asset test for fiscal year 1988, its decision to withhold reimbursement of the district's bad debts was an abuse of discretion and contrary to law.

10. *Determinations.*

■ The secretary's final argument is that the district did not determine indigence status for some patients, but it merely accepted a signed declaration of inability to pay. If true, this would be a violation of a mandatory provision of the regulations.

The district determined indigence of some patients who had no income whatsoever by the patient's representation that he had no income. A statement of *no income* is materially different from a statement of *inability to pay.* The conclusion that one is unable to pay needs to be supported by evidence of the income the patient receives. There is little evidence of no income at all. The district cannot require the patient to prove a negative. The district's acceptance of the signed statements of no income was within the rules.

### B. Changing The Useful Life

11. *Facts.*

Until 1990 the district operated two hospitals. Jefferson Davis Hospital was opened in 1939. The original Ben Taub Hospital was opened in 1964. Both facilities were significantly renovated over the years.

The hospitals had annual inspections by the fire department. They could not get their operating licenses from the state of Texas renewed without fire department approval. In 1982, the fire marshal told the district of numerous violations of the fire code and announced that, if the building was not brought into compliance with the code, he would shut them down. The fire marshal never gave the district a deadline or a formal order and, in fact, never shut the facilities. He did, however, force one annex of the Jefferson Davis facility to close for fourteen months; it was permitted to reopen after changes were made. The district received its license renewals annually.

By the end of 1982 the district, for reasons that included warnings of the fire marshal, decided to replace both facilities. Groundbreaking on Lyndon B. Johnson Hospital and new Ben Taub occurred in 1985 and 1986, and the replacement facilities opened in 1989 and 1990. Neither of the old facilities is currently in use.

12. *Depreciation.*

Useful life determines how long a facility has to depreciate its value for cost accounting. Under Medicare the estimated useful life of a facility is its normal operating life to the district. 42 C.F.R. § 413.134(b)(7). Each year the district is allowed to deduct that year's reduction in the value of the facility as a current cost—its depreciation. Jefferson Davis's useful life is due to continue until 1996. Old Ben Taub's useful life continues to run until 2006. While both facil-

ities are nearing the end of their useful lives, because of renovations in the 1970s, especially to Jefferson Davis, a higher percentage of value for depreciation purposes remains in the facilities than one would expect by comparing the origin dates.

In 1985, the district requested Blue Cross to change the useful lives of the facilities to terminate on the dates when the facilities would no longer be used. That request was denied and has made it through the bureaucracy to this court.

### 13. *Prudence.*

To the extent that the secretary challenges the prudence of the district's decision to build new facilities rather than bring the old ones up to code, the overwhelming weight of the evidence says otherwise. The total cost of renovation to comply with the fire code in existence in 1990 would have been $186.8 million. That renovation would not have provided any functional improvements. At the time of decision, the estimated cost of building the two new facilities with functional improvements was $207.4 million. It is beyond argument that the district made the prudent decision, probably the only decision it reasonably could have made. That does not mean, however, that it is automatically entitled to change the useful life for Medicare purposes.

### 14. *Regulatory Factors.*

 The regulations allow a change in the initial estimated useful life if clear and convincing evidence justifies a redetermination. 42 C.F.R. § 413.134(b)(7)(iii). In deciding whether to approve the change, Blue Cross is to take into account the factors that are considered in establishing initial useful lives. These include

A. Normal wear and tear;

B. Obsolescence due to normal economic and technological changes;

C. Climatic and other local conditions; and

D. The district's policy for repair and replacement.

42 C.F.R. § 413.134(b)(7). The regulations explicitly exclude an expected early sale, re-

tirement, demolition, or abandonment of an asset. 42 C.F.R. § 413.134(b)(7)(i)(B). ("Expected early sale" is in the regulation. What it could reasonably mean is unknown.)

While it is clear that the facilities had very little functional value once the district closed them, the point of departure for the court must be before the decision to close the facilities. The facilities were not shut down by outside forces. The fire marshal never closed them; rather the district and he collaborated on a plan to bring the buildings into compliance with the code, setting the priority of the order the renovations would be made.

That the district decided to build new facilities as opposed to renovating hopelessly out-of-date facilities is to its credit. One of the costs of facilities substitution was acceptance of an unusable depreciation schedule. The factors listed in the regulations in favor of shortening the useful lives are not present. In fact, the facilities have been retired and functionally abandoned before the end of their useful lives. That is a factor explicitly excluded from reconsideration. The fact that the district cannot legally abandon the facilities under Texas law is irrelevant.

The district asserts that it had no plan to retire the facilities before the fire marshal's warning. This is an admission that the facilities could have continued in operation until their useful lives had expired. The fire marshal's decision to make the district bring the facilities into compliance with the code merely increased the capital cost to the district of maintaining the facilities. It was not an event that made the initial useful life an impossibility. The consequence for the district is particularly onerous from its perspective because the federal law no longer directly compensates the districts for capital costs, but that is one price of dependency.

Likewise, the district's reliance on the fourth enumerated factor, its policy for repair and replacement, is misplaced. The decision to scrap the buildings in favor of new ones because of the fire code problems is not a policy of the district. It was a one-time decision in response to a one-time event with admittedly long-term consequences.

The standard for the district to force a change in the useful lives was a high one. This court agrees with the secretary that the district did not meet its burden. In any event, it cannot be said that the secretary abused her discretion in denying the change in useful life even though the district's decision to replace rather than renovate the hospitals is eminently reasonable. Occasionally two governmental programs addressing the same social problem are both reasonable and yet still conflict with each other.

15. *Conclusion.*

Split decisions generally lead to rematches. These contestants will probably soon be off to another venue to fight once more. Until then, the secretary's ruling will be affirmed on the useful life and reversed on the reimbursement of bad debt.

FINAL JUDGMENT

1. The secretary of the Department of Health and Human Services' denial of reimbursement of bad debts to the Harris County Hospital District is reversed. (# 16)

2. The secretary's denial of the district's request to change the useful lives of its two former hospitals is affirmed. (# 18)