**Donna E. SHALALA, Secretary of Health and Human Services, Appellant,**

v.

**ST. PAUL–RAMSEY MEDICAL CENTER, a Minnesota nonprofit corporation, Appellee.**

**No. 94–1380.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1994.

Decided March 14, 1995.

Jeffrica J. Lee, Washington, DC, argued (Frank W. Hunger, David Lee Lillehaud, Anthony J. Steinmeyer and Jeffrica Jenkins Lee on the brief), for appellant.

Albert Shay, Washington, DC, argued (James Gaynor, Jr., Chicago, IL, and Albert W. Shay, Washington, DC, on the brief), for appellee.

Before HANSEN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HANSEN, Circuit Judge.

The Secretary of Health and Human Services (the Secretary) appeals the district court's [1] order reversing the Secretary's decision to deny reimbursement of $495,679 in Medicare "bad debt expenses" to St. Paul–Ramsey Medical Center (Ramsey). The Secretary argues that Ramsey failed to satisfy the requirements governing the reimbursement of "bad debt expenses" arising from the treatment of indigent patients. The district court agreed with Ramsey that the Secretary was applying requirements that have never been imposed and concluded that Ramsey had satisfied those requirements which did in fact exist. We affirm.

I.

A. *Regulatory Structure and Reimbursement System*

Ramsey is a provider of services under the Medicare program. "Provider hospitals" participate in the Medicare program by entering into a "provider agreement" with the Secretary. Medicare is a two-part program. Part A covers reimbursement of hospital inpatient costs and posthospital extended care costs. Part B is a voluntary program providing supplemental health insurance for physi-

---

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Floyd E. Boline, United States Magistrate Judge for the District of Minnesota.

cian's services, medical equipment, outpatient services, laboratory services and the like. The issue presented in this case is a Part A reimbursement dispute.

Under Part A, Medicare pays the bulk of a Medicare inpatient's hospital costs for the services provided by the provider hospital. Medicare does not, however, pay all of the costs for the patient. The patient remains responsible for paying all deductibles and coinsurance amounts to the hospital. The hospital retains the responsibility for collecting these monies.

The Medicare program reimburses some of the hospital's general operational "reasonable costs" and seeks to avoid both shifting the costs of providing Medicare services from Medicare patients to non-Medicare patients and the hospital's shifting of non-Medicare patient costs to the Medicare program. 42 U.S.C. § 1395x(v)(1)(A). Congress specifically left a gap in the statute and gave the Secretary the authority to establish the regulations which define "reasonable costs" and which prevent Medicare costs from being shifted to the provider hospitals. *Id.* Under the regulations that the Secretary has developed, the amounts a hospital is unable to collect from a Medicare patient for unpaid deductible and coinsurance amounts ("bad debts") are treated as reductions in the hospital's revenue—not "reasonable costs" the hospital incurs because they are not actual "costs" in the delivery of care. However, in keeping with the prohibition against shifting Medicare costs to provider hospitals, the Secretary has determined that "the costs attributable to the deductibles and coinsurance amounts that remain unpaid [by the Medicare patient] are added to the Medicare share of allowable costs." 42 C.F.R. § 413.80(d). For those amounts to qualify as a reimbursable Medicare generated "bad debt", generally the hospital must first make "reasonable collection efforts" to recover the deductible and coinsurance amounts still owing. 42 C.F.R. § 413.80(e).

The Secretary has issued a number of guidelines and manuals, to assist interested parties in navigating the shoals of the Medicare compensation and reimbursement system. Health Care Financing Administration

Publication 15–1, commonly referred to as the Provider Reimbursement Manual ("PRM" or "manual"), is the main source. In the PRM, the Secretary relaxes the "reasonable collection efforts" requirements in the case of "indigent" Medicare patients stating that a "bad debt" may be deemed uncollectible without requiring the hospital to undertake "reasonable collection efforts" if the patient is "indigent" as determined by the criteria under section 312 of the PRM. Section 312 contains detailed criteria for determining indigency, and its language provides the main focus of the dispute in this case.

As a general matter, section 312 requires the provider to use its customary method for determining indigency when it determines if a Medicare patient is indigent. Section 312 also contains the following specific requirements which are relevant to this case: the fact of indigence should be determined by the hospital and not the patient, i.e., the patient's signed declaration of indigency is not enough; the provider should look to and analyze all of the patient's resources, liabilities, income, and expenses; and the patient file should contain documentation of the method used to determine indigency and the information upon which the determination is based. The Secretary's main contention in this case is that Ramsey failed to satisfy the requirement that the hospital, not the patient, must determine whether or not the patient is, in fact, indigent.

The Medicare program reimburses costs to provider hospitals through a "fiscal intermediary," normally an insurance company under contract to the Secretary. The fiscal intermediary essentially acts as a claims adjustor for the Secretary and determines how much of the hospital's claimed Medicare reimbursement costs should be paid. The provider hospital is required to file an annual cost report with the intermediary which supplies the basis for the provider hospital's Medicare reimbursement requests. The intermediary analyzes the claims made in the report, performs an audit, and eventually issues a written Notice of Program Reimbursement (NPR) informing the provider hospital of the amount of reimbursement to which it is entitled.

If the provider hospital is not satisfied with the intermediary's determination of what the hospital is entitled to by way of reimbursement, and the amount in controversy exceeds $10,000, the provider hospital can request a hearing before the Provider Reimbursement Review Board (PRRB), which is within the Department of Health and Human Services. The decision of the PRRB is the final agency determination of the reimbursement claim unless the Secretary on her own motion (acting through the Chief Administrator of the Health Care Financing Administration), decides to affirm, reverse, or modify the decision of the PRRB. If the provider hospital is dissatisfied with the final agency determination, the provider hospital may then seek judicial review of the agency's decision in accordance with the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

In 1987, Congress enacted legislation as part of the Omnibus Budget Reconciliation Act (OBRA), which essentially prohibits the Secretary from changing the "bad debt reimbursement policies" from those existing in 1987. The OBRA legislation includes a provision specifically stating that the Secretary cannot make a provider hospital change its indigency determination procedure if the fiscal intermediary had approved the hospital's indigency determination procedure in the past in accordance with the rules existing as of 1987.[2]

## B. *Factual & Procedural Background*

Ramsey has two programs for elderly indigent patients as part of its Senior Health Care Center: (1) the Low and Moderate Income Program (LAMP) for indigent Medicare patients; and (2) the Hill–Burton[3] program for indigent non-Medicare patients. This case involves claimed reimbursements for the LAMP program, which uses the same income eligibility standards as the Hill–Burton program, except that the LAMP program imposed an additional asset guideline for the relevant year.

To be eligible for LAMP, patients must be eligible for Medicare and must be indigent. Enrollment in LAMP is valid for one year and may be renewed annually. Ramsey accepted the financial information provided by both LAMP and Hill–Burton patients at face value and did not attempt to independently verify the accuracy of the income and assets the patients listed on Ramsey's information forms. It used the same procedure to determine the indigency of Medicare patients in 1986 as it had in all prior years.

Ramsey made a claim for reimbursement of those Medicare patient generated "bad debt expenses" relating to LAMP for the 1986 fiscal year, like it had in all other prior years. Blue Cross and Blue Shield Associa-

**2.** The full OBRA moratorium provides:

CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL SERVICES—In making payments to hospitals under [the Medicare program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with the unpaid deductible and coinsurance amounts incurred under such [Medicare program] (including criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency).

The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining wheth-

er to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.
Omnibus Budget Reconciliation Act of 1987 (OBRA), Pub.L. No. 100–203, § 4008(c), 101 Stat. 1330, 1330–55, as amended by the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 8402, 102 Stat. 3342, 3798, as amended by the Omnibus Reconciliation Act of 1989, Pub.L. No. 101–239, § 6023(a), 103 Stat. 2106, 2167.

**3.** The Hill–Burton program gets its name from the Hill–Burton Act, 42 U.S.C. §§ 291–291o–1, which ties receipt of federal hospital construction money to the hospital's furnishing a certain level of services to indigent non-Medicare patients. The hospital must provide a yearly set amount of free service to Hill–Burton qualified patients, directly related to how much construction money the hospital received from the federal government.

tion/Blue Cross and Blue Shield of Minnesota served as the intermediary, as it had in other years prior to 1986. Blue Cross had allowed full reimbursement in prior years, and initially allowed the 1986 claim, in full, as well. However, Blue Cross later reopened the 1986 claim and in an NPR dated September 26, 1989, disallowed $495,679 in claimed reimbursements.

Ramsey appealed the Blue Cross decision to the PRRB. After an evidentiary hearing, the PRRB concluded that Blue Cross had properly disallowed Ramsey's reimbursement claim. The PRRB found that Ramsey had failed to comply with the requirements of section 312 of the PRM. The PRRB specifically held that Ramsey had failed to comply with section 312 of the PRM because Ramsey "simply accepted whatever financial information was supplied by the patients, ... the patient's indigency was determined by the patient and not the provider [Ramsey]." (R. at 13.) The PRRB concluded that Ramsey had poor records and reiterated that Ramsey essentially had allowed the patients to determine their own indigency because Ramsey had no policy for *verifying* indigency. (*Id.* at 14.)

The PRRB also held that Blue Cross's reopening of the case did not violate the OBRA moratorium. The PRRB specifically found that "the Intermediary's reopening was based on the discovery of new information and was not an attempt by the Intermediary to apply new policies." (*Id.*) The Secretary, acting through the Administrator of the Health Care Financing Administration (HCFA), declined to review the PRRB decision and it became the final agency action.

Ramsey sought judicial review in the District of Minnesota. Both parties moved for summary judgment. The case was referred to a magistrate judge, who recommended that the district court find that the Secretary's decision was contrary to law and not supported by substantial evidence in the record and that Ramsey's motion for summary judgment be granted and the Secretary's motion for summary judgment be denied. The district court adopted the magistrate judge's report and recommendation and re-

versed the Secretary's decision. The Secretary appeals.

## II.

The Secretary makes two arguments in this case: (1) that the district court erred in not deferring to the Secretary's interpretation of section 312 of the PRM, which interpretation requires Ramsey to independently verify the patient's declaration of income and assets for purposes of determining indigency; and (2) that the district court erred in determining that the Secretary's denial of reimbursement violated the 1987 OBRA moratorium on changes to bad debt reimbursement policy. We address them in order.

### 1. *Independent Verification*

The PRRB spoke for the Secretary in interpreting section 312 of the PRM, which is the agency's written policy on the subject of determining indigency. The PRRB denied Ramsey's claim for reimbursement after finding that section 312 required the hospital to verify the income and asset statements of patients and that Ramsey had failed to do so. Ramsey concedes that it did not independently verify the information contained in the income and asset statements the patients submitted as proof of indigency, but argues that section 312 does not require and has never required Ramsey to take steps to independently verify information provided by the patients.

The PRRB relied almost entirely on section 312 to support its position that Ramsey was required to independently verify the information provided by the patients in determining indigency. Section 312 provides:

> In some cases the provider may have established before discharge, or within a reasonable time before the current admission, that the beneficiary is either indigent or medically indigent. Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively. Otherwise, the provider should apply its customary methods for determining the indigence of patients to the case of the

Medicare beneficiary under the following guidelines:

A. The patient's indigence must be determined by the provider, *not by the patient,* i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigency;

B. The provider should take into account a patient's total resources which would include, but are not limited to, an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities, and income and expenses. In making this analysis the provider should take into account any extenuating circumstances that would affect the determination of the patient's indigence;

C. The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., title XIX, local welfare agency and guardian;

D. The patient's file should contain *documentation* of the method by which indigence was determined in addition to all backup information to substantiate its determination.

Once indigence is determined and the provider concludes that there had been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 [reasonable collection efforts] procedure.

PRM Section 312 (Appellant's App. at 33) (emphasis added). The PRRB concluded that Ramsey's failure to independently verify the information presented by the patients essentially violates section 312(A) by allowing the patient, not Ramsey, as the provider, to determine indigent status. Without verification from an independent source, the PRRB

also found that there was insufficient documentation for the purposes of section 312(D). The PRRB found, and the Secretary is arguing here on appeal, that an independent verification requirement thus is implied in section 312.

The district court found that section 312 did not expressly contain a verification requirement and granted summary judgment for Ramsey, reversing the Secretary's denial of Ramsey's reimbursement claim. We review the district court's decision de novo, making our own independent review of the Secretary's decision under the APA. *See Good Samaritan Hosp. v. Sullivan,* 952 F.2d 1017, 1023 (8th Cir.1991).

The manual does not explicitly require verification. Hence, we must review the Secretary's interpretation that section 312 implicitly contains a requirement for independent verification. We begin with the familiar guiding principles the Supreme Court set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. [Those] regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. at 2782. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Id.* at 844, 104 S.Ct. at 2782.

When, like in this case, the issue is whether the agency has erred in interpreting its own regulations [4], the Supreme Court has

4. Here, the issue is whether the Secretary properly construed a provision in the PRM—which normally is construed to contain only non-binding interpretive rules. *See Shalala v. Guernsey Memorial Hosp.,* —— U.S. ——, ——, 115 S.Ct. 1232, 1238, 131 L.Ed.2d 106 (1995) (treating a section of PRM as "prototypical example of an interpretive rule" and not requiring notice and comment procedures); *Columbus Comm. Hosp. v. Califano,* 614 F.2d 181, 187 (8th Cir.1980) ("A provision of the Provider Reimbursement Manual [PRM] is an agency interpretive rule, not subject to the rulemaking procedures of the Admin-

istrative Procedures Act"). Normally, we treat interpretive rules, in contrast to legislative rules, as mere agency statements which provide guidance to parties but which do not have the force of law. *Guernsey Memorial Hosp.,* —— U.S. at ——, 115 S.Ct. at 1239 ("Interpretive rules ... do not have the force and effect of law and are not accorded that weight in the adjudicatory process"); *Drake v. Honeywell, Inc.,* 797 F.2d 603, 607 (8th Cir.1986) (interpretive rules "cannot be independently enforced as law," and "[a]n action based on a violation of an interpretive rule does not state a legal claim" because interpretive rules are not mandatory and "never can be vio-

stated that: provided the agency's interpretation "does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *see also Columbus Comm. Hosp.,* 614 F.2d at 187 (quoting *Bowles* ). Thus, as a general rule, where the agency is interpreting its own regulations or it own legislative rules, that interpretation is entitled to substantial deference. *See, e.g., Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (agency's interpretation of its own regulation must be given substantial deference); *Brewster on Behalf of Keller v. Sullivan,* 972 F.2d 898, 901 (8th Cir.1992) ("as a general rule an agency's interpretation of its own regulation is entitled to great deference"). We are required to "defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Thomas Jefferson Univ.,* —— U.S. at —— – ——, 114 S.Ct. at 2386–87 (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)); *see also Creighton Omaha Reg. Health Care Corp. v. Bowen,* 822 F.2d 785, 789 (8th Cir.1987) ("An administrative agency's interpretation of its own regulation deserves considerable deference ... A reviewing court should not reject reasonable administrative interpretation even if another interpretation may also be reasonable.").

Even applying these exceptionally deferential standards, we nevertheless conclude that the Secretary's interpretation of section 312 of the PRM to contain an unwritten but implied independent verification requirement is "plainly erroneous or inconsistent" with

the text of section 312. *Columbus Community Hosp.,* 614 F.2d at 187 (quoting *Bowles,* 325 U.S. at 414, 65 S.Ct. at 1217). We agree with the magistrate judge's opinion, which the district judge adopted, finding that section 312 simply does not contain a requirement of "verification." Section 312(A) states that indigency must be determined by the provider and not the patient. The fact that Ramsey bases its determination on information supplied by patients (without independent verification), does not mean that Ramsey allows the patients to determine indigency on their own. On the basis of the information that the patients *supply,* it is undisputed that only Ramsey itself determines whether that information satisfies the indigency requirements. Here, the Secretary seeks to impose additional unstated and unwritten requirements pertaining to the nature and quality, i.e., verification, of the information used for the indigency determination—not who ultimately makes the determination. Section 312(A) is absolutely silent on that issue and it does not support an interpretation which imposes an additional implied verification requirement.

It is one thing to say that the ultimate fact of indigency should not be determined by the person who claims to be indigent; it is quite another to say that indigency cannot be determined by the hospital based on factual financial information furnished solely by the patient. The Secretary's rule does an excellent job of the former with its example that a patient's signed declaration of indigency is not sufficient; with respect to the latter, it fails completely to inform hospital administrators that they cannot base their own independent determination of indigency on factual financial information furnished by the patient, and it totally lacks any language from which a separate verification requirement can be implied.

Here it is clear that Ramsey did everything it was required to do by subsection B of § 312 as it is written. It took into account

lated"). However, both parties, the PRRB, and the district court, appear to have treated section 312 of the PRM to provide both the binding requirements and the sole method for Ramsey to recover Medicare cost reimbursements without undertaking "reasonable collection efforts." Be-

cause this issue has not been briefed or argued by the parties we will, for the purposes of this case only, treat section 312 as providing a binding agency rule, and we will review the Secretary's interpretation with substantial deference.

each Medicare patient's total resources, which included its analysis of the patient's assets, liabilities, and income and expense using the factual information that the patient had provided. What it did not do is what § 312 does not require to be done—independently verify the information provided by the patient. In essence, the Secretary, by her interpretation, adds language to the second sentence of subsection B which would modify it to read: "In making this analysis the provider [must verify the financial information furnished by the patient and] should take into account any extenuating circumstances that would affect the determination of the patient's indigence."

Likewise, section 312(D) requires documentation of the method and information used in the indigency determination. When a provider identifies its method for determining indigency and the information used to make that determination, the provider satisfies all requirements of section 312(D), express and implied. There is no dispute that Ramsey identified its method of determining indigency (an income and asset test) and the information upon which it based its determination (the patient's statement of income and assets). Thus, we conclude that Ramsey has satisfied all of the relevant requirements of section 312.[5]

The Secretary's interpretation of section 312 imposes an additional verification requirement that, though not existing anywhere in the text of section 312, is an implied overlay stretching across subsections 312(A), (B), and (D).[6] We agree with the Third Circuit that while the "plainly erroneous" standards should be applied to the agency's interpretation where the meaning of the agency rule or regulation is ambiguous or in doubt, "we are not at liberty to allow the agency to imply language that does not exist in the regulation." *Beazer East, Inc. v.*

*United States Env't Protection Agency,* 963 F.2d 603, 607 (3d Cir.1992). Stated another way, we do not defer to the Secretary's interpretation when an " 'alternative reading' is compelled by the regulation's plain language...." *Thomas Jefferson Univ. Hosp.,* —— U.S. at ——, 114 S.Ct. at 2386 (quoting *Gardebring,* 485 U.S. at 430, 108 S.Ct. at 1314).

We conclude that there is no ambiguity in the rule at issue in this case. The plain language of section 312 reveals no verification requirement. The Secretary's interpretation simply has sought to add a requirement to section 312 that does not appear in the plain meaning of the rule. Accordingly, we cannot defer to the Secretary's interpretation, which reads unwritten and additional terms into the rule in question.

### 2. *1987 OBRA Moratorium*

We need not reach the Secretary's second argument because we conclude that the district court's decision may be affirmed in full on the first issue.

### III.

Because we find the Secretary's interpretation of section 312 to be plainly erroneous and inconsistent with the language of the rule itself, we affirm the district court's reversal of the Secretary's decision denying Ramsey's claim for bad debt expense reimbursement. *See Creighton Omaha Reg. Health Care Corp.,* 822 F.2d at 789 (an agency's interpretation that is plainly erroneous or inconsistent with the agency rule "must be reversed").

---

**5.** The PRRB also made a similar observation that Ramsey failed to comply with the documentation requirements laid out in 42 C.F.R. §§ 413.20 and 413.24. The PRRB provided no analysis of how Ramsey failed to comply with these sections and essentially relied on the same reasons that Ramsey failed to comply with the documentation requirement in section 312(D) of the PRM. Accordingly, we reject the Secretary's arguments that Ramsey failed to comply with 42 C.F.R.

§§ 413.20 and 413.24 for the same reason that we reject the Secretary's arguments about section 312(D) of the PRM.

**6.** The Secretary's interpretation essentially, and perhaps unintentionally, says that Ramsey must assume that Medicare patients cannot be trusted to make an honest statement of their assets and income.