_____

94-3067
_____

Hennepin County Medical Center,     *
                                    *
     Plaintiff - Appellee,          *
                                    *   Appeal from the United States
     v.                             *   District Court for the
                                    *   District of Minnesota
Donna E. Shalala,                   *
                                    *
     Defendant - Appellant.         *
                              _____

                    Submitted:   November 16, 1995

                       Filed:   April 9, 1996
                              _____

Before HANSEN, JOHN R. GIBSON, and MURPHY, Circuit Judges.
                              _____

MURPHY, Circuit Judge.

     The Secretary of Health and Human Services Donna Shalala appeals from
a judgment in favor of Hennepin County Medical Center (HCMC).  HCMC sought
review in the district court of the Secretary's decision to disallow some
of its claims for reimbursement of bad debts related to Medicare patients.
Both sides moved for summary judgment, and the district court granted the
motion of HCMC after concluding that several amendments to the Medicare Act
(Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 et
seq.) prevent the Secretary from disallowing the claims.  We affirm in
part, reverse in part, and remand.

     Medicare patients are often responsible for both deductible and
coinsurance payments for hospital care.  When Medicare patients fail to
make these payments to the care providers, the government

will reimburse hospitals if they have made reasonable collection efforts. 42 C.F.R. § 413.80(e). Congress authorized the Secretary to promulgate regulations to ensure that hospitals would not be forced to shift these costs to non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A)(i). In order to qualify for reimbursement, hospitals must comply with a network of collection, record keeping, and reporting regulations and rules. This case involves a decision by the Secretary to disallow a reimbursement for 1983 which had already been made to HCMC.

## I.

Hospitals that provide Medicare services may prepare a reimbursement request which includes deductible and coinsurance amounts owed, but not paid, by Medicare patients. The Secretary employs private entities, called intermediaries, to review the requests made by provider hospitals. Blue Cross & Blue Shield of Minnesota was the intermediary used by the Secretary to review HCMC's reimbursement requests.

A provider may seek review by the Provider Reimbursement Review Board (PRRB) of an intermediary's decision regarding a reimbursement request. 42 C.F.R. §§ 405.1835, 405.1841. Following a PRRB ruling, either party may request that the Administrator of the Health Care Financing Administration (HCFA), an agency of the Department of Health and Human Services, exercise his discretion to review the case. 42 C.F.R. § 405.1875. If the Administrator declines to review the case, the PRRB decision becomes the decision of the Secretary. Id. Otherwise, the Administrator's decision is considered the decision of the Secretary. Id. In either event, the provider may seek judicial review under most circumstances. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877. Federal jurisdiction in this case also is based on the Administrative Procedure Act, 5 U.S.C. § 701-706.

For HCMC's fiscal year beginning January 1, 1983, it reported that Medicare patients had failed to make roughly $500,000 in payments. Blue Cross did a full field audit of the request in early 1985 and found that some of the services listed in the request were not eligible for reimbursement under Medicare.[1] It reduced the claimed amount accordingly and then issued a notice of program reimbursement in September 1985. As a result HCMC received roughly $385,000 in reimbursement for Medicare bad debts.

During the audit the intermediary also requested information regarding HCMC's collection efforts directed at Medicare bad debt patients. The HCMC business office manager provided the hospital's written collection policies and assured the auditor that HCMC used the same methods of collection regardless of a patient's Medicare eligibility.

A year later, Blue Cross was auditing HCMC's 1985 reimbursement request. During this audit, the intermediary was concentrating on reviewing the bad debt collection policies of providers. Blue Cross asserts that the HCMC business office manager told the auditor that it did not pursue the bad debts of Medicare patients as vigorously as those of non-Medicare patients. The manager allegedly said that non-Medicare patients received a series of five letters before their accounts were turned over to a collection agency. Medicare patients, on the other hand, received only one or two phone calls, and their accounts were also apparently not turned over to collection agencies. Blue Cross also claims that the manager told the auditor that the differing collection policies had been in effect for several years, not just for the 1985 fiscal year which was the subject of the audit. In response, the intermediary requested more information about HCMC's

---

[1]The intermediary's decisions to disallow several other claims, which were also upheld by the PRRB, are not at issue on this appeal.

collection policies.  Some evidence suggests that HCMC promised to provide documentation regarding its collection efforts for 1985, but never produced any.

Blue Cross then decided to reopen its reimbursement recommendation for 1983, pursuant to 42 C.F.R. § 405.1885.  Under the regulations the intermediary, or various Health and Human Services entities, may reopen a determination within three years of the date the notice of program reimbursement is issued if "new and material evidence" is discovered, if there was "a clear and obvious error," or if the earlier determination was "inconsistent with the law, regulations or rulings, or general instructions."  HCFA Pub. 15-1 § 2931.2; see State of Oregon on Behalf of Oregon Health Sciences Univ. v. Bowen, 854 F.2d 346, 350 (9th Cir. 1988).  In a September 1988 letter, Blue Cross informed HCMC both of the decision to reopen the 1983 determination and of its intention to disallow all of the bad debt claims.  In a subsequent letter several weeks later, Blue Cross indicated that "until such time as you supply us with convincing evidence to support your position, the adjustments will stand as proposed."

The disallowance was based on two types of reimbursement claims by HCMC.  If a Medicare patient is indigent, a provider need not always try to collect deductible and coinsurance payments before submitting them to the intermediary as bad debts.  HCMC had therefore included in its request patients it considered indigent because a different county agency had determined them to be eligible for Medicaid.  Blue Cross disallowed some claims because it concluded that HCMC did not obtain and store documentation supporting these indigency determinations from the other county agency.

The second disallowance category relates to the quality of HCMC's efforts to collect unpaid deductible and coinsurance payments from non-indigent Medicare patients and its alleged

-4-

failure to provide documentation of those efforts. Based on the business office manager's alleged statements that HCMC used different collection procedures for Medicare than for non-Medicare patients, Blue Cross concluded that the hospital might be in violation of the rules requiring similar collection efforts. Blue Cross argues that the decision to reopen the 1983 cost year followed HCMC's failure to provide documentation of its collection efforts for any of the cost years covered by the manager's alleged statements. HCMC claims that no documentation was ever requested for the 1983 cost year at issue here. It also argues that its collection efforts were reasonable, as required by the regulation and as demonstrated by its eighty percent collection rate on Medicare accounts, regardless of any alleged dissimilarity in its collection efforts.

HCMC appealed the intermediary's decision to the PRRB under 42 U.S.C. § 1395oo and 42 C.F.R. § 405.1835. After an extensive hearing which also addressed other issues, the PRRB concluded that Blue Cross had properly reopened the 1983 determination based on new information discovered during the subsequent audit. The board also concluded that HCMC had not complied with the reporting regulations in that it had not provided the documentation requested by the intermediary. In late 1991 the PRRB thus upheld the intermediary's decision to disallow the bad debt reimbursement. HCMC next appealed to the Administrator of the HCFA, who declined to review the decision. The decision of the PRRB therefore became the final decision of the Secretary. 42 C.F.R. § 405.1875.

HCMC sought judicial review of the Secretary's decision in the district court under 42 U.S.C. § 1395oo(f)(1), and each party moved for summary judgment. The district court granted the motion of HCMC and denied the Secretary's motion. Concluding that the Secretary's decision to disallow the reimbursement was barred by several amendments to the Medicare Act, the court entered judgment in favor of HCMC.

**II.**

The three amendments relied on by the district court were passed by Congress (in 1987, 1988, and 1989) in response to heightened scrutiny by intermediaries and HCFA of Medicare bad debt reimbursement requests. H.R. Conf. Rep. No. 1104, 100th Cong., 2d Sess. 277 (1988), reprinted in 1988 U.S.C.C.A.N. 5048, 5337 (1988 Conf. Rep.). In 1986, the inspector general of Health and Human Services had proposed either eliminating bad debt reimbursement entirely or attempting to recoup the costs by garnishing the Social Security checks of debtors. Proposal Would Tap Social Security Payments, New York Times, December 3, 1986 at A24; HHS Inspector General Urges Deducting Unpaid Bills from Social Security Checks, 13 BNA Pension & Benefits Reporter 49, at 2037 (December 8, 1986). Neither proposal was adopted. The inspector general then called for much closer examination of providers' bad debt requests. See HHS Inspector General Continues to Recommend Scrapping or Revamping Bad-Debt Reimbursement, Modern Healthcare, June 17, 1991, at 50.

Congress responded with the first amendment:

> In making payments to hospitals under [the Medicare program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including the criteria for what constitutes a reasonable collection effort.)

Omnibus Budget Reconciliation Act of 1987 (OBRA), Pub. L. No. 100-203, § 4008(c), 101 Stat. 1330-55, 42 U.S.C. § 1395(f) note.

The inspector general continued to urge closer scrutiny of bad debt requests. During the fiscal year beginning October 1, 1987, intermediaries disallowed forty percent of providers' bad debt reimbursement requests. See HHS Inspector General Continues to Recommend Scrapping or Revamping Bad-Debt Reimbursement, Modern

-6-

Healthcare, June 17, 1991, at 50.

In 1988 Congress again amended the Medicare Act to add the following to the amendment passed in 1987:

> including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency).

Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 8402, 102 Stat. 3798, 42 U.S.C. 1395(f) note.

In 1989 it added another paragraph:

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6023, 103 Stat. 2167, 42 U.S.C. § 1395(f) note. Congress made the 1989 amendment retroactive to 1987. H.R. Conf. Rep. No. 386, 101st Cong., 1st Sess. 737 (1989), reprinted in 1989 U.S.C.C.A.N. 3018, 3340 (1989 Conf. Rep.). We will refer to the amendments collectively as the OBRA moratorium, or simply, the moratorium.[2]

---

[2]In its final form, the moratorium reads:

> In making payments to hospitals under [the Medicare program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including the criteria for what constitutes a reasonable collection effort including criteria for indigency determination procedures, for

record keeping, and for determining whether to refer a claim to an external collection agency).

The district court concluded that, for the purposes of the moratorium, the intermediary had "accepted" HCMC's Medicare bad debt policies regarding indigency determination and collection procedures for 1983 when it issued the notice of program reimbursement following the audit in 1985. The intermediary and the Secretary were therefore prohibited from disallowing the reimbursements already made for the 1983 cost year.

The Secretary appealed the decision on both types of disallowance. At oral argument, however, the Secretary conceded that the HCMC's indigency determination procedures were adequate and that the disallowance of those claims was improper under the rules and regulations. Because the Secretary has conceded that the disallowance of this portion of HCMC's bad debt claims was in error, we need not discuss indigency determination further, and the district court should be affirmed in that respect. The issues remaining relate to HCMC's collection procedures regarding non-Medicaid patients with delinquent accounts.

### III.

The central issue to be decided in this case is whether the OBRA moratorium barred the reopening of the 1983 cost year. Both sides focus on language in the second paragraph of the moratorium, added in 1989. The district court concluded that the intermediary

The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

had "in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, [] accepted such policy before that date . . . ." It therefore concluded that the moratorium prevented reopening of the 1983 cost year and precluded the Secretary's disallowance in this case. We conclude that the moratorium may not have barred reopening in this situation and remand to the district court so that it may consider the factual circumstances in light of the legal framework discussed below.

Judicial review of the Secretary's decision is governed by the Administrative Procedure Act (APA), 5 U.S.C. 706(2)(A). <u>Shalala v. St. Paul-Ramsey County Medical Center</u>, 50 F.3d 522 (8th Cir. 1995). Under the APA, the Secretary's decision shall be set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law. Federal court review is de novo, <u>id.</u> at 527, but is limited to the administrative record.

The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation. <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984). If there is ambiguity in a statute that an agency has been entrusted to administer, however, the agency's interpretation is controlling when embodied in a regulation, unless the interpretation is "arbitrary, capricious, or manifestly contrary to the statute." <u>Id.</u> at 843-44. An agency's interpretative rules, which are not subject to APA rulemaking procedures, are nonbinding and do not have the force of law. <u>Ramsey County Medical Center</u>, 50 F.3d at 528 n.4. In this case the Secretary has developed a comprehensive set of rules contained in the Provider Reimbursement Manual (PRM). <u>Id.</u>

Part of the task of statutory interpretation is to seek to interpret the statute in a way that includes every word and clause.

However, "we must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and to its object and policy." U.S. National Bank of Oregon v. Independent Insurance Agents, 113 S. Ct. 2173, 2182 (1993) (internal citations omitted).  Although the wording of the section of the 1989 amendment at issue in this case is not precise, the structure and history of the three incremental amendments provide considerable guidance in interpreting the section.

The OBRA moratorium states unambiguously that the Secretary may not impose new or different bad debt criteria on a provider after August 1, 1987, if the intermediary had "accepted" the provider's policies before that date in accordance with the rules in effect on that date.  What constitutes an acceptance by the intermediary, however, and how it must "accord" with the rules is not immediately apparent.  Careful review of the language and structure of the amendments, along with their legislative histories, shows they are sufficiently clear to support the conclusion that there is no "gap" to be filled by the Secretary's interpretation of the statute.[3]  See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

**A.**

HCMC argues that the issuance of a notice of program reimbursement is a clear acceptance.  The district court agreed, stating that the notice proved acceptance "conclusively."  Hennepin County Medical Center v. Shalala, No. 3-91-725, slip. op. at 7 (D. Minn. Nov. 2, 1993).  The Secretary responds that the reopening regulation, 42 C.F.R. § 405.1885, allows a determination to be revisited within three years of the issuance of the notice.  She

---

[3]The Secretary's interpretation of the OBRA moratorium is not entitled to deference where the plain meaning of the amendments is sufficient to guide our decision.  See Chevron, 467 U.S. at 842-43 (1984).

contends that reopening is consistent with the intent of Congress, especially when based on new and material evidence indicating the initial determination was in error.

A notice of program reimbursement, and the reimbursement that flows from it, are the only tangible forms of acceptance a provider can expect from an intermediary. As HCMC points out, there is no other mechanism through which a provider can submit a given policy and receive formal approval by the Secretary or the intermediary. In the majority of cases, the notice of program reimbursement is the final consideration of a policy by an intermediary. A conclusion that a notice of program reimbursement cannot constitute an acceptance is therefore untenable.

A reimbursement notice will not always be equivalent to an acceptance, however. Congress enacted the moratorium with the intention of preserving the bad debt reimbursement rules and regulations as they existed prior to August 1, 1987.

> [T]he conferees do not intend to preclude the Secretary from disallowing bad debt payments based on regulations, PRRB decisions, manuals and issuance is [sic] in effect prior to August 1, 1987.

1988 Conf. Rep. 277, reprinted in 1988 U.S.C.C.A.N. at 5337.

When the Secretary seeks to disallow bad debt payments already made to a provider, she must proceed to reopen the notice of program reimbursement within three years of the date it was issued. 42 C.F.R. § 405.1885. Once a cost year is reopened, the Secretary may disallow all or some of the reimbursement. The reopening regulation has been in place for many years and is in accord with the agency's authority under the Medicare Act. See HCA Health Services of Oklahoma, Inc. v. Shalala, 27 F.3d 614, 618 (D.C.Cir. 1994); State of Oregon on Behalf of Oregon Health Sciences Univ. v. Bowen, 854 F.2d 346, 349 (9th Cir. 1988).

If the issuance of a notice of program reimbursement were invariably an acceptance, as HCMC argues and the district court decided, the reopening regulation and others issued before August 1, 1987 would be superfluous. This would frustrate the intent of Congress that existing regulations be enforced. It appears that a notice of program reimbursement functions as an acceptance by the intermediary in most cases, the vast majority of which apparently go unchallenged by the provider and are never reopened.

In this case, it seems that two factors -- the thoroughness of the audit of the 1983 cost year, and the alleged new and material information -- may be particularly relevant in determining whether the intermediary accepted HCMC's policies. Because the district court never reached these factual issues, however, it is preferable that it be given an opportunity to determine whether the reopening was both justified and in compliance with the moratorium under these circumstances.[4]

**B.**

Because the district court concluded that the issue of acceptance was dispositive, it did not reach the second clause of the 1989 amendment and consider whether any acceptance was "in

---

[4]The result reached by the Fifth Circuit in <u>Harris County Hospital District v. Shalala</u>, 64 F.3d 220 (5th Cir. 1995), the only other appellate case to address the issue, is not necessarily in conflict with our conclusion that a notice of program reimbursement is not always an acceptance. There the issuance of the notice of program reimbursement was said to be an acceptance "after an investigation and audit." <u>Id.</u> at 222. It is unclear from the opinion whether the audit thoroughly explored the issue at question. There also was apparently no new information available to the intermediary or the Secretary to suggest that reopening was warranted. On remand, the district court may find that this case is factually distinguishable. In any event, we do not read <u>Harris County</u> to hold that any audit and investigation is necessarily sufficient to make a notice of program reimbursement an acceptance.

accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency."[5] The concepts of acceptance and accordance are intertwined in the statutory amendment relating to bad debt collection policy, the meaning of the "in accordance" language was thoroughly briefed by the parties, and some discussion of its application to this case may aid the district court on remand.

In the only other case directly confronting this issue, the district court concluded that, contrary to the Secretary's arguments in that case, the "in accordance" clause in the 1989 amendment modifies "accepted" rather than "policy". <u>Harris County Hosp. Dist. v. Shalala</u>, 863 F. Supp. 404, 408-09 (S.D.Tex. 1994), <u>aff'd</u> 64 F.3d 220 (5th Cir. 1995) (<u>see</u> <u>supra</u> note 4). It reasoned:

> The secretary wants [the 1989 amendment] to say that she cannot force a hospital to change the policy only if the policy is in accord with the rules. If the policy is not, then she can. That would leave nothing to the moratorium.

<u>Id.</u> at 408-09. HCMC makes the same argument here. We agree that the "in accordance" clause modifies "accepted", but that does not end the matter.

HCMC argues that the process used by the intermediary in accepting a provider's policy must be "in accordance" with the existing rules, rather than the substance of the accepted policy

---

[5]The relevant portion of the 1989 amendment reads:

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, <u>in accordance</u> with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has <u>accepted</u> such <u>policy</u> before that date . . . .

(emphasis added).

-13-

itself.  This reading, which was also adopted by the district court in Harris County, is inconsistent with the clause "with respect to the criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency." If Congress had meant only to require that the intermediary had followed the procedural rules governing program reimbursement, the word "criteria" would be unnecessary.  The only reasonable interpretation of "criteria" in this instance refers to those criteria set out in the Act, rules, regulations, and PRRB decisions that apply to providers.  Whether an intermediary correctly applied those criteria necessarily invokes the substance of the provider's policies to which the criteria were applied. We reject HCMC's reading because it fails adequately to account for the inclusion of the word "criteria" by Congress.

In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the inspector general's proposed changes in the criteria for bad debt reimbursement.  1988 Conf. Rep. 277, reprinted in 1988 U.S.C.C.A.N. at 5337.  Permitting correction of errors made by intermediaries in the application of rules existing on August 1, 1987 is consistent with that policy.  It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria after that date, but allowing full enforcement of the policies in place before it.

Requiring that a provider's policies were in accord with the rules existing in 1987 does not render the moratorium meaningless.  It leaves intermediaries, the PRRB, HCFA, and the Secretary free to correct improper applications of the rules as they existed and as they were interpreted on August 1, 1987.  It prevents those entities from retroactively applying new rules or new interpretations of existing rules, however.  This interpretation coincides with the intent of Congress that the inspector general not revise the Secretary's interpretations of the existing rules.

If Congress had intended to address the manner in which intermediaries conducted their investigations and issued notices of program reimbursements, it certainly could have done so. The language of the amendments indicates, however, that it was the provider's compliance with the existing regulations that would trigger the moratorium's protection from retroactive changes.

There is also no indication that the 1989 amendment was intended to prevent the Secretary from applying the rules existing on August 1, 1987, as Congress had explicitly intended she be able to do under the 1987 and 1988 amendments. 1988 Conf. Rep. 277, reprinted in 1988 U.S.C.C.A.N. at 5337. The 1989 conference report describes the amendment in that year as a "Clarification of continuation of August 1987 hospital bad debt recognition policy." 1989 Conf. Rep. at 737, reprinted in 1989 U.S.C.C.A.N. at 3340 (emphasis added). The House Report from the same year emphasized that the amendment "further clarified" the "existing prohibition." H.R. Rep. No. 247, 101st Cong., 1st Sess. 998-99 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2469-70. Since the 1989 amendment was a clarification of the earlier amendments, there is no reason to believe that Congress intended to disavow its earlier statements that the existing rules, including the reopening regulation, were to be enforced.

We conclude on this analysis that Congress intended the moratorium to apply only where a provider was in compliance with rules existing on August 1, 1987, as embodied in the regulations, the PRM, and PRRB decisions. The Secretary may not retroactively apply a more stringent interpretation of those existing rules, nor may she or an intermediary reopen a notice of program reimbursement if the intermediary's interpretation of the existing rules leading to the issuance of the notice was reasonable and based on

-15-

sufficient information.[6]

The record keeping and collection rules at issue here were in force on August 1, 1987.[7]  The requirement that "[t]he provider must be able to establish that reasonable collection efforts were made" before a delinquent account may be considered allowable bad debt has remained essentially unchanged since it was promulgated in 1966.  42 C.F.R. § 413.80(e)(2) (redesignated twice, see 42 Fed. Reg. 52,826, (1977); 51 Fed. Reg. 34,790 (1986)).  The PRM section requiring "similar" collection efforts for Medicare and non-Medicare patients has been in place since 1968 without relevant amendment.  PRM § 310.  The same section requires that "[t]he provider's collection effort should be documented in the patient's file by copies of the bill(s), follow-up letters, reports of telephone and personal contact, etc."  Id.  The PRRB had refused to reimburse hospitals based on both grounds -- unsatisfactory collection efforts and inadequate documentation -- well before the

---

[6]Preventing disallowance under the moratorium when an intermediary has accepted a provider's policy based on a reasonable interpretation of the rules in existence on August 1, 1987 is consistent both with the moratorium and the Secretary's interpretation of it.  HCFA Memorandum to Regional Administrators, HCFA Clarification of Bad Debt Policy (June 11, 1990), reprinted in [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,623.

[7]At the time of the reopening, the PRRB had ruled that it was not always necessary under existing regulations to submit the accounts of Medicare patients to outside collection agencies. See, e.g., St. Francis Hospital and Medical Center v. Blue Cross and Blue Shield Assoc./Kansas Hospital Service Assoc., PRRB Hearing Dec. No. 86-D21 (Nov. 12, 1985), reprinted in [1986-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 35,302; Reed City Hospital v. Blue Cross and Blue Shield Assoc./Blue Cross and Blue Shield of Michigan, PRRB Hearing Dec. No. 86-D67 (Feb. 20,1986), reprinted in [1986-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 35,474.  Any failure of HCMC to use collection agencies should not therefore affect the final result in this case.

1987 moratorium date.[8] Thus, if the district court determines on remand that there was sufficient new and material information to justify the reopening, it appears that the "in accordance" clause of OBRA should not bar the Secretary's actions.

## IV.

Accordingly, the judgment is vacated, and the matter is remanded for further proceedings consistent with this opinion. The order of the district court is reversed as to the claims relating to bad debt collection efforts, but its order is affirmed as to the claims relating to indigency determination.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[8]See, e.g., Davie County Hospital v. Blue Cross and Blue Shield Assoc/Blue Cross/Blue Shield of North Carolina, PRRB Hearing Dec. No. 84-D89 (March 22 ,1984), reprinted in [1984-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 33,939 (dissimilar collection efforts); Buckeye Home Health Service, Inc. v. Blue cross of Central Ohio, Blue Cross and Blue Shield Assoc., PRRB Hearing No. 83-D108 (July 14, 1983), reprinted in [1983-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 33,098 (inadequate collection efforts and poor documentation justify disallowance); Amador Hospital v. Blue Cross Assoc./Blue Cross of Northern California, PRRB Hearing Dec. No. 80-D83 (Oct. 3, 1980), reprinted in [1980-81 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 30,748 (failure to document bad debts under PRM § 310.B).