United States Court of Appeals,

Eleventh Circuit.

No. 95-9493.

UNIVERSITY HEALTH SERVICES, INC., Plaintiff-Appellee,

v.

HEALTH & HUMAN SERVICES, Donna Shalala, in her official capacity as Secretary, Defendant-Appellant.

Aug. 28, 1997.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV193-180), Dudley H. Bowen, Jr., Judge.

Before BIRCH, BLACK and CARNES, Circuit Judges.

BIRCH, Circuit Judge:

This appeal requires that we examine regulations and interpretive guidelines promulgated pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395cc ("the Medicare Act"). The Secretary of Health and Human Services ("Secretary") appeals the judgment of the district court in favor of University Health Services ("University"). University sought review in the district court of the Secretary's decision to disallow a portion of its claims for reimbursement of bad debts related to Medicare patients. The district court determined that the Secretary was precluded from disallowing University's bad debt claims and granted summary judgment in favor of University. For the reasons that follow, we REVERSE.

## I. BACKGROUND

The Medicare Act permits hospitals and other health care providers to enter into an agreement with the Secretary by which the Secretary reimburses providers through private fiscal intermediaries for amounts owed, but not paid, by Medicare patients. 42 U.S.C. § 1395cc. To qualify for reimbursement with respect to these bad debt claims, hospitals must comply with regulations directing them to make reasonable efforts to collect Medicare deductible and coinsurance amounts. Specifically, Medicare bad debt constitutes an allowable cost if the following criteria are met:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.80(e).

The Secretary has delineated further the regulation's bad debt collections requirement in its Provider Reimbursement Manual ("PRM"). Provisions of the PRM relevant to this action state in pertinent part:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts for non-Medicare patients....
>
> A. *Collection Agencies.*—A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters, telephone and personal contacts. Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. The "like amount" requirement may include uncollected charges above a specified minimum amount. Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency.

PRM § 310.

> *Presumption of Noncollectibility.*—If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.

PRM § 310.2.

In 1987, Congress enacted the Omnibus Budget Reconciliation Act ("OBRA") that placed a moratorium on, among other things, the Secretary's authority retroactively to modify Medicare bad debt reimbursement policy that was in effect on August 1, 1987. The moratorium provides, in pertinent part:

> In making payments to hospitals under [the Medicare Program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for

2

reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency).

The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

OBRA of 1987, Pub.L. No. 100-203, § 4008(c), *as amended by* Technical and Miscellaneous Revenue Act of 1988, § 8402 and OBRA of 1989, § 6023.

University is a non-profit hospital located in Augusta, Georgia. The intermediary in this case is Blue Cross and Blue Shield of Georgia ("Blue Cross"). It is undisputed that University historically has pursued comparable in-house collection efforts for both Medicare and non-Medicare accounts for the first 120 days after the last activity on each account, consistent with the applicable Medicare regulations. Until 1989, University wrote off as bad debt all delinquent accounts following this 120-day period and referred all non-Medicare accounts to an in-house collection agency. University did not forward outstanding Medicare accounts to the collection agency but, rather, claimed and received, through Blue Cross, reimbursement for these amounts from the Medicare program. In 1989, Blue Cross conducted a full audit of the 1986 cost year and determined that University's bad debt collection practice, specifically with respect to the referral of solely non-Medicare overdue accounts to a collection agency, was inconsistent with Medicare policy. Accordingly, Blue Cross disallowed the 1986 bad debt claim.

University sought administrative review of Blue Cross's decision. The Provider Reimbursement Review Board ("PRRB") found that University had demonstrated that sound business judgment justified its dissimilar treatment of Medicare and nonMedicare accounts after 120 days following the last activity on these accounts. In support of its findings, the PRRB noted that University had shown financial losses in connection with collection efforts in the 1989-1991 cost

3

years, during which University complied with the intermediary's directive to refer all accounts, both Medicare and non-Medicare, to its internal collection agency.

The Secretary reversed the PRRB decision and concluded that University had failed to show that it had engaged in reasonable collection efforts with respect to its Medicare accounts. The Secretary premised her conclusion on the grounds that (1) University's bad debt collection method was inconsistent with the plain language of the Secretary's interpretive guidelines of the Medicare Act, embodied in the PRM, directing providers to treat similarly Medicare and non-Medicare overdue accounts; (2) University had failed to show that sound business judgment justified its decision not to refer Medicare accounts to its collection agency; and (3) because University had not acted in compliance with the pertinent Medicare regulations in 1986, the moratorium articulated in OBRA did not apply to the facts of this case and, thus, did not bar the intermediary's disallowance of reimbursement costs for that cost year.

The district court reversed the Secretary's decision and ordered that summary judgment enter in favor of University. The court found that, for many years prior to 1986, University had employed the same collection practices as those used in 1986 and that Blue Cross previously had allowed reimbursement of University's bad debt claims. The court further stated that the Secretary tacitly had ratified University's collection efforts through the acts of her intermediary and, consequently, her change in policy with respect to the 1986 cost year had an unfair retroactive effect. Based on this reasoning, the court concluded that the Secretary was equitably estopped from disallowing reimbursement for 1986. Alternatively, the court found that the OBRA moratorium barred the Secretary from denying University's claim for bad debt reimbursement. This appeal followed.

## II. DISCUSSION

"In reviewing the Secretary's decisions, both the district court and [our] court must abide by those decisions "unless [they are] arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence in the record taken as a whole.' " *Alacare Home Health Serv., Inc. v. Sullivan,* 891 F.2d 850, 854 (11th Cir.1990) (quoting *Carraway Methodist Med.*

4

*Center v. Heckler,* 753 F.2d 1006, 1009 (11th Cir.1985)) (alteration in original). "We previously have noted that the Secretary has amassed considerable expertise in the health care area and absent a strong showing by the plaintiff, "this court will not substitute its judgment for that of the agency.' " *Id.* (quoting *Lloyd Noland Hosp. & Clinic v. Heckler,* 762 F.2d 1561, 1565 (11th Cir.1985). Although an agency's interpretive rules do not have the force of law, *Shalala v. St. Paul-Ramsey Med. Ctr.,* 50 F.3d 522, 527 n. 4 (8th Cir.1995), the Secretary's interpretation of her own regulations are "controlling unless plainly erroneous or inconsistent with the regulation," *Auer v. Robbins,* --- U.S. ----, ----, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (internal quotation marks omitted)).

The Secretary advances several arguments on appeal in support of the request that her decision to disallow University's bad debt reimbursement claim for the 1986 fiscal year be upheld: (1) because the plain language of the applicable regulations and PRM provisions prohibit dissimilar treatment of Medicare and non-Medicare outstanding accounts, and the intermediary only learned of University's bad debt collection practices after a full audit in 1989, the Secretary's disallowance of the 1986 reimbursement claim was fair, consistent with the regulations, and did not constitute retroactive, unfair rule-making; (2) the legislative moratorium on disallowance of Medicare bad debts was not triggered under the facts of this case; and (3) the record does not adequately support University's contention that its bad debt collection practices were justified by sound business judgment.[1] University responds that the Secretary's decision is arbitrary, capricious, and in conflict with both Medicare policy and OBRA. We address each of these arguments in turn.

A. Fairness of Secretary's Decision

University submits, in essence, that the Secretary's decision in this case is unfair. This argument consists of three facets: (1) the Secretary's decision is based on an unreasonable

---

[1]Although the Secretary also takes issue with the district court's analysis with respect to equitable estoppel, University does not squarely present this argument in its brief and appears to not rely on it as a basis for affirming the district court's judgment. We note, in addition, that equitable estoppel against the government does not serve as an appropriate legal theory on which to base reversal of the Secretary's decision in this case. We therefore deem this argument to be abandoned and, more importantly, without merit.

interpretation of the governing interpretive rules; (2) the Secretary's retroactive disallowance of the reimbursement claim constitutes retroactive rulemaking and, thus, is arbitrary and not entitled to deference; and (3) the decision is not supported by substantial evidence and, if permitted to stand, would conflict with the policy underlying the applicable Medicare regulation.

We disagree. The administrative guidelines germane to this action are found in PRM §§ 310 and 310.2, outlined above. These rules guide both a provider and intermediary as to what constitutes reasonable collection efforts, on the one hand, and the point in time at which a debt may be deemed uncollectible, on the other hand. The only issue in this case is whether University pursued reasonable collection efforts with respect to its Medicare accounts; this is the subject solely of PRM § 310, which unambiguously directs providers to treat similarly uncollected charges of Medicare and non-Medicare patients. University contends that PRM § 310 read in tandem with PRM § 310.2, which deems a debt uncollectible if unpaid beyond 120 days after the last activity on an account, is subject to only one logical interpretation: that is, once a provider has pursued Medicare and non-Medicare accounts equally for the first 120 days, it then may deem both accounts to be uncollectible and refer only non-Medicare accounts to a collection agency.[2] Under the Secretary's reading of the two relevant provisions, however, PRM § 310 requires similar treatment of all patient accounts of comparable size regardless of the point in time at which the collection effort is measured. PRM § 310.2 does not come into effect unless the provider has complied with PRM § 310 in treating identically all Medicare and non-Medicare accounts and has ceased collection efforts with regard to all accounts after 120 days.

---

[2]University further suggests that a provider may engage in this debt collection practice if the decision to do so is supported by sound business reasons. In adding this requirement, University appears to concede that its practice of treating uncollected Medicare and non-Medicare accounts dissimilarly, in the absence of a financial justification, *see* 42 C.F.R. § 413.80(e)(4), does not comply with PRM § 310. Assuming that a showing of sound business judgment may, in certain circumstances, justify non-compliance with the rule at issue but does not alter our reading of that rule. At any rate, the Secretary determined that University had failed adequately to demonstrate that its practice was supported by sound business judgment. We discuss this aspect of the Secretary's decision in greater detail below.

6

We find the Secretary's interpretation of PRM §§ 310 and 310.2 to be entirely plausible and consistent with the regulation's directive that a provider expend reasonable collection efforts before claiming and receiving reimbursement from the Medicare program for uncollected charges. The undisputed purpose of this requirement is to ensure that a provider treat similarly those accounts for which the provider has no guarantor as those for which the government acts as guarantor. Compliance with this policy presumably prevents Medicare from being used as a payor for unpaid bills that might yet be paid by the responsible party. We cannot conclude that the Secretary's interpretation of the PRM guidelines drafted pursuant to the "reasonable collection effort" regulation is arbitrary, plainly erroneous, or inconsistent with Medicare policy. We therefore are bound to give controlling weight to the Secretary's interpretation of the governing regulation and accompanying guidelines. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994).

We similarly are unpersuaded by University's suggestion that, because the intermediary previously had allowed University's claims for reimbursement, the Secretary's subsequent disallowance of the claim constitutes unfair, retroactive rulemaking. It is undisputed that the PRM guidelines relevant to this case were available to University prior to the 1986 fiscal year. It also is undisputed that Blue Cross first discovered University's bad debt collection practices and its concomitant non-compliance with PRM § 310 in its 1989 full audit of the 1986 cost year; there is no allegation or indication that Blue Cross had been supplied with the necessary information to discover University's practices prior to the audit. The intermediary thus discovered new, material information previously unavailable to it that informed its decision to disallow certain claims not in conformity with governing Medicare rules and policies. University fails to demonstrate how this decision constitutes a substantive change or a different application of the Secretary's policy

7

prohibiting dissimilar treatment of Medicare and non-Medicare accounts as embodied in PRM § 310.[3]

Finally, we note briefly that the Secretary's decision not to credit University's business reasons as justifying non-compliance with the similar-treatment policy with respect to Medicare and non-Medicare accounts is supported by substantial evidence. In support of its business-related justification, the Secretary found that University relied principally on "(1) historical evidence showing that the Provider was more successful in collecting amounts due from Medicare accounts than from non-Medicare accounts; and (2) a generalized perception that the Medicare patients would likely either pay their deductible and coinsurance obligations during the initial 120-day collection period or would not be inclined or able to pay." R2-11 (footnote omitted). In addition, the Secretary considered evidence submitted by University indicating that costs with respect to collection efforts increased in the 1989-1991 fiscal years, during which University referred both Medicare and non-Medicare accounts to its collection agency. Significantly, the Secretary determined that, although University had provided some financial rationale for its decision to treat

---

[3]In support of the proposition that its 1986 bad debt collection efforts were reasonable, University points to a memorandum issued in 1990 by the Health Care Financing Administration clarifying PRM § 310.2 in light of the OBRA moratorium. The memorandum states, in relevant part:

> We believe that an intermediary could reasonably have interpreted the title of section 310.2, *Presumption of Noncollectibility,* to provide that an uncollectible account could be presumed to be a bad debt if the provider has made a reasonable and customary attempt to collect the bill for at least 120 days even though the claim has been referred to a collection agency. Such an interpretation is reasonable unless it is apparent that the debt is not a bad debt, for example, because the beneficiary is currently making payments on account, or has currently promised to pay the debt.

University contends that this passage ratifies University's interpretation of the applicable guidelines and confirms that the language of the PRM is ambiguous. However, as noted by the Secretary, the clarifying memorandum refers expressly to PRM § 310.2, which is not at issue in this case. The memorandum also explicitly emphasizes that, notwithstanding any possible confusion with regard to PRM § 310.2, "the bad debt policy is otherwise unaffected by the above discussion." Contrary to University's position, we do not find that the above-memorandum shows either that the Secretary has acted arbitrarily here or that the provider is not necessarily required to treat similarly Medicare and non-Medicare accounts.

8

dissimilarly Medicare and non-Medicare accounts after 120 days, its stated reasons were largely speculative, inconclusive, and inconsistent.

We need not express a view as to whether we agree or disagree with the Secretary's determination. Our review of the record reveals that the Secretary's conclusion that University failed adequately to show that it had engaged in reasonable collection efforts based on sound business judgment is supported by substantial evidence. *See Bama Tomato Co. v. U.S. Dept. of Agric.,* 112 F.3d 1542, 1546 (11th Cir.1997) ("Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Although University submitted evidence of some increased costs in the 1989-1991 fiscal years, it did not conclusively demonstrate that these increased costs would have been incurred in 1986 if Medicare accounts had been referred along with non-Medicare accounts. Moreover, the Secretary noted but dismissed as speculative University's assertion that, based on its experience in the community, pursuit of Medicare patients who had not paid their accounts after 120 days was not likely to result in further recovery; we cannot say that the Secretary's conclusion in this regard is insupportable.[4] In sum, we find that the Secretary's determination that University had failed adequately to support its dissimilar

---

[4]At oral argument, University argued that two former PRRB decisions, *St. Francis Hosp. and Med. Ctr. v. Blue Cross and Blue Shield Ass'n/Kansas Hosp. Ass'n,* PRRB Decision No. 86-D21 (Nov. 12, 1985), and *Reed City Hosp. v. Blue Cross and Blue Shield Ass'n,* (Feb. 20, 1986), in which the PRRB found that sound business judgment justified dissimilar treatment of Medicare and non-Medicare bad debt claims, constitute the Secretary's expression of policy and, thus, mandate that the Secretary reach the same determination with respect to the facts of this case. Although it is true that, given the facts and records presented in connection with *St. Francis Hospital* and *Reed City Hospital,* the Secretary found that the providers had engaged in reasonable business practices notwithstanding their dissimilar treatment of Medicare and non-Medicare accounts, these decisions constitute specific applications of the relevant regulations and guidelines and, therefore, do not dictate a given result in light of the specific circumstances presented here. Stated differently, the records in *St. Francis Hospital* and *Reed City Hospital* apparently supported the providers' contentions that sound business judgment justified their respective treatment of Medicare accounts; in this case, the Secretary found that the record and hearing testimony were inadequate to support the same claim. Because we cannot say the Secretary's decision is inconsistent with the weight of the administrative record in connection with *this* case, any further inquiry regarding University's sound-business-judgment justification necessarily must end.

treatment of Medicare and non-Medicare accounts is supported by the record and, therefore, must be affirmed on that basis.

B. *Effect of Legislative Moratorium (OBRA)*

As an alternative basis on which to grant summary judgment in favor of University, the district court found that the legislative moratorium embodied in OBRA of 1987, as amended, barred the Secretary's retroactive disallowance of Medicare bad debt reimbursement for fiscal year 1986. As previously noted, the moratorium prohibits the Secretary from imposing new or different bad debt criteria on a provider after August 1, 1987, if the intermediary had "accepted" the provider's policies before that date in accordance with the rules then in effect. The district court reasoned that Blue Cross's previous allowance of University's bad debt claims constituted acceptance of University's bad debt criteria. The court further determined that, because University's bad debt collection practices were reasonable and consistent with PRM §§ 310 and 310.2, they were in accordance with the rules in effect prior to the moratorium.

University essentially reiterates on appeal the district court's discussion and adds that the Secretary's retroactive disallowance would constitute an application of either a new rule or a more stringent version of the rule known to the provider prior to OBRA's enactment. University again suggests that the Secretary's reading of PRM § 310 is strained and gives rise to a substantive retroactive modification of Medicare policy that OBRA was intended to prevent.

The Secretary argues that OBRA is not triggered under the facts of this case. The Secretary suggests that the intermediary's previous allowance of University's bad debt claim cannot be construed as acceptance pursuant to OBRA because (1) acceptance must be express and based on full, accurate information, unavailable to Blue Cross in this instance until after a full audit; (2) even if the intermediary's allowance of a claim is deemed to be equivalent to tacit acceptance by the Secretary, the intermediary's approval of a provider's bad debt collection practice is ineffective if the practice later is found to be inconsistent with Medicare policy and rules; and (3) the moratorium prohibits the Secretary from requiring a provider to change its bad debt policy (assuming a fiscal

10

intermediary previously has accepted such policy) with respect to referral of claims to an external collection agency; the collection agency used by University was in-house and, therefore, not within the scope of OBRA.

Two circuits courts to have addressed the effect of OBRA on retroactive disallowance of Medicare bad debt claims have reached somewhat conflicting (though not necessarily contrary) results. *Harris County Hospital District v. Shalala,* 64 F.3d 220 (5th Cir.1995), relied on by University, involved the Secretary's decision retroactively to disallow a hospital's Medicare bad debt claim based on the hospital's alleged non-compliance with regulations outlining the method of determining whether a patient is indigent. The Fifth Circuit held that, although OBRA does not explicitly define the term "acceptance," an intermediary's previous repayment of a provider's claim for Medicare reimbursement of bad debt following an investigation and audit constitutes "acceptance" for purposes of triggering the moratorium. *Id.* at 222. Because the acceptance occurred prior to August 1, 1987, OBRA barred the Secretary from later disallowing an earlier claim for reimbursement. *See id.*

*Hennepin County Medical Center v. Shalala,* 81 F.3d 743 (8th Cir.1996), concerned the Secretary's decision to reopen and re-audit its recommendation for reimbursement for a previous fiscal year based on new information indicating that the hospital had not engaged in equally vigorous collection efforts with respect to Medicare and non-Medicare accounts prior to the 120-day mark. The Eighth Circuit observed that, because "[a] notice of program reimbursement and the reimbursement that flows from it, are the only tangible forms of acceptance a provider can expect from an intermediary," allowance of a bad debt claim by an intermediary could, in the majority of cases, function as a form of acceptance of the provider's bad debt practices. *Id.* at 749. The court further held, however, that

> [a] reimbursement notice will not always be equivalent to an acceptance.... Congress enacted the moratorium with the intention of preserving the bad debt reimbursement rules and regulations as they existed prior to August 1, 1987....

11

> If issuance of a notice of program reimbursement were invariably an acceptance .... the reopening regulation and others issued before August 1, 1987 would be superfluous. This would frustrate the intent of Congress that existing regulations be enforced.

*Id.* The court also interpreted OBRA's requirement that acceptance be "in accordance with the rules in effect as of August 1, 1987" to mean that, for acceptance to trigger the terms of the moratorium, the provider's bad debt collection practices must have been consistent with Medicare rules existing in 1987:

> In passing the moratorium, Congress was motivated to prevent unexpected consequences to providers from the inspector general's proposed changes in the criteria for bad debt reimbursement. Permitting correction of errors made by intermediaries in the application of rules existing on August 1, 1987 is consistent with that policy. It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria after that date, but allowing full enforcement of the policies before it
>
> ....
>
> We conclude on this analysis that Congress intended the moratorium to apply only where a provider was in compliance with rules existing on August 1, 1987, as embodied in the regulations, the PRM, and PRRB decisions.

*Id.* at 751.

We find the reasoning advanced by the Eighth Circuit in *Hennepin* to be persuasive and, therefore, adopt it in light of the facts of this case.[5] As noted by that court, in the vast majority of cases, an intermediary's allowance of a claim remains unchallenged and undisturbed; it therefore serves as the functional equivalent of acceptance of the provider's claim in those cases. Where the intermediary conducts a full audit and discovers new, previously unavailable information indicating that the provider's practices were not consistent with Medicare rules and guidelines in existence prior to August 1, 1987, however, the moratorium is not triggered and retroactive disallowance may be appropriate. We also reject University's restatement of the proposition that the Secretary's

---

[5]Significantly, the *Hennepin* court noted that its decision might not be directly contrary to that reached by the Fifth Circuit in *Harris. See Hennepin,* 81 F.3d at 750 n. 4. In *Harris,* the intermediary already had conducted an audit before allowing the provider's bad debt claim. The decision does not indicate whether the audit specifically targeted the provider's Medicare bad debt collection practices, nor is there any suggestion that new, material evidence had been made available to the intermediary subsequent to its allowance. *Harris,* therefore, is factually distinguishable from both *Hennepin* and the instant case.

disallowance of its Medicare bad debt claim constitutes either a new substantive rule or a stiffer application of a pre-existing rule; as discussed previously, we do not view the Secretary's application of PRM § 310 in this instance to be tantamount to rulemaking, nor is it an unfair, inconsistent application of a policy not previously known to providers. We conclude that the Secretary's disallowance of University's Medicare bad debt claim for the 1986 fiscal year is not barred by the OBRA moratorium.

## III. CONCLUSION

In this appeal, the Secretary asks that we affirm the decision to disallow retroactively University's Medicare bad debt claim for the cost year 1986. The Secretary bases this retroactive disallowance on evidence acquired by the fiscal intermediary in connection with a 1989 full audit of University's Medicare bad debt collection practices indicating that University had failed to engage in reasonable collection efforts of unpaid Medicare accounts. More specifically, it is undisputed that, during the audit, the intermediary discovered that University had not treated similarly Medicare and non-Medicare accounts that remained outstanding following a 120-day billing cycle. University contends that the Secretary's disallowance constitutes unfair, retroactive rulemaking and is barred by the OBRA moratorium of 1987. We conclude that the Secretary's decision is (1) neither arbitrary nor inconsistent with the governing Medicare policies, rules, and guidelines; (2) supported by substantial evidence adduced in the administrative record; and (3) not barred by the legislative moratorium embodied in OBRA of 1987. Accordingly, we REVERSE the district court's order and REMAND with instructions to enter judgment in favor of the Secretary.