**DETROIT RECEIVING HOSPITAL**
**and University Medical Center,**
**Plaintiff,**

**v.**

**Donna E. SHALALA, in her official capacity as Secretary of the Department of Health and Human Services, Defendant.**

**No. 96–CV–75525–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

March 27, 1998.

Kenneth R. Marcus, West Bloomfield Hills, MI, for Plaintiff.

Mary Rigdon, Asst. U.S. Atty., Detroit, MI, for Defendant.

### OPINION AND ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff Detroit Receiving Hospital and University Health Center ("Plaintiff" or "Hospital") filed this civil action on December 6, 1996, pursuant to the "Medicare Act" (42 U.S.C. § 1395 et seq.), seeking judicial review of a financial decision rendered by the Administrator of the Health Care Financing Administration ("HCFA") acting as the delegate of Defendant Donna Shalala Secretary of the Department of Health and Human Services ("HHS").

This action arises out of HCFA's reversal of the Provider Reimbursement Review Board ("PRRB"). HCFA ruled that a portion of Plaintiff's claim for "Medicare bad debt" should be disallowed, and, therefore, that Plaintiff should not be reimbursed for $722,650 of its Medicare bad debt claim.

Plaintiff and Defendant have filed Cross Motions for Summary Judgment. Having heard oral argument and reviewed the parties' briefs and supporting exhibits, the Court is now prepared to rule on these motions.

## II. BACKGROUND FACTS

Plaintiff is an acute care inpatient trauma hospital. Defendant is the Secretary of HHS and is responsible for the administration of the Medicare Program pursuant to the Medicare Act. She has delegated administration of the Medicare Program to HCFA.

HCFA, through the fiscal intermediary Blue Cross and Blue Shield of Michigan ("Intermediary"), pays providers a proportionate share of their total cost of operation. Medicare will not share in the overall costs of bad debts and uncompensated care furnished by the provider. However, for Medicare patients only, Medicare will pay the provider for coinsurance and deductible amounts left unpaid by its patients ("Medicare bad debt"). Therefore, the costs attributable to unpaid Medicare deductibles and coinsurance amounts are added to Medicare's share of a provider's allowable costs. At the end of each cost reporting period, the Intermediary determines the total amount of reimbursement due a provider for that period based on a review and audit of the annual cost report submitted by the provider. The Intermediary issues a "Notice of Program Reimbursement" ("NPR") that details the Intermediary's determination along with an adjusted cost report.

The provider may appeal the Intermediary's determination to the PRRB. A provider also has the right to obtain judicial review of any final decision of the PRRB or of a favorable decision by the PRRB that was reversed by the Administrator of HCFA.

## III. FACTS

Plaintiff claimed in its cost report for the fiscal year ending December 31, 1991 $944,-448 as Medicare bad debt, and submitted a Medicare Bad Debt Report to the Intermediary in support of its claim. In reviewing Plaintiff's cost report, the Intermediary disallowed $722,650 of Plaintiff's claim based on the fact Plaintiff referred its non-Medicare bad debt to a collection agency and did not refer its Medicare bad debt to a collection agency.

Plaintiff sought a hearing with the PRRB regarding the Intermediary's disallowance of its claim for Medicare bad debt, claiming that Plaintiff's collection efforts were reasonable and the Intermediary's disallowance violated

the Congressional Moratorium imposed by Section 4008(c) of Omnibus Budget Reconciliation Act '87 ("bad debt moratorium" or "OBRA").

The PRRB decided that Plaintiff's collection procedures were reasonable based on the small likelihood of recovery for Medicare bad debt, but remanded the case to the Intermediary to determine if Plaintiff followed its bad debt collection procedures. However, the HCFA Administrator reversed the PRRB's decision, holding the Intermediary's adjustments to Plaintiff's claim for Medicare bad debt was consistent with Medicare regulations requiring reasonable collection efforts. The Administrator also found that the Providers Reimbursement Manuel ("PRM"), issued by Defendant, properly establishes that in order to constitute "reasonable collection efforts," a provider who sends non-Medicare bad debt to a collection agency must also send Medicare bad debt to a collection agency. The Administrator further stated that the disallowance was not in violation of the bad debt moratorium because the record failed to show that the Intermediary "accepted" the Plaintiff's practices within the meaning of the bad debt moratorium.

Plaintiff claims that the HCFA Administrator erred in reversing the PRRB's decision and wrongly denied Plaintiff Medicare reimbursement. Defendant submits that the Court should affirm the decision.

## IV. STANDARD OF REVIEW

Judicial review of a decision by the Secretary or Administrator brought under the Medicare Act, 42 U.S.C. § 1395oo(f), requires the Court to decide the case pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The APA enables the Court to set aside any administrative ruling that is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. 5 U.S.C. § 706(2). In *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), a recent case involving Medicare regulation 413.85(c), the Supreme Court stated that courts must give "substantial deference to an agency's interpretation of its own regulations." (Cites omitted). The Court further stated:

Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " Ibid. (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988). This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991).

## V. ANALYSIS

### A. REASONABLE COLLECTION EFFORTS

■ Medicare regulation 42 C.F.R. § 413.80(e) sets forth the criteria which must be met in order for a bad debt to be considered an allowable cost under Medicare:

(e) Criteria for allowable bad debt. A bad debt must meet the following criteria to be allowable:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) *The provider must be able to establish that reasonable collection efforts were made.*

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

(Emphasis added). The Secretary has issued a Provider Reimbursement Manual ("PRM"), under her interpretative rule making authority, to explain and clarify the application of the reimbursement regulations. With respect to the "reasonable collection efforts," the PRM states:

§ 310. Reasonable Collection Effort.

To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. . . .

A. Collection Agencies.—A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters, telephone and personal contacts. *Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient.* . . . Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency. (Emphasis added).[1]

The Administrator disallowed $722,650 of Plaintiff's Medicare bad debt claim because Plaintiff did not establish that "reasonable collection efforts" were made to recover the Medicare bad debt since it had referred its non-Medicare bad debt to a collection agency, but did not refer its Medicare bad debt. Thus, Plaintiff implicitly concedes that it failed to meet the PRM's requirements for reasonable collection efforts.

However, Plaintiff argues that the PRM is not a valid and binding regulation, and that under 413.80, it did make reasonable collection efforts. Regulation 413.80(e)(2) clearly does not require that Medicare accounts be referred to a collection agency. Rather, the

Secretary based her disallowance of payment on § 310 of the PRM, which is not a valid regulation and does not have the force of law. In the "Foreword" to the PRM, HCFA acknowledges that the PRM "provides guidelines and policies" and "does not have the effect of regulations." The Board has ruled that the attempt of HCFA to impose such a requirement in the PRM, instead of in its Medicare Regulations, is invalid:

The Board finds that HCFA is using the manual to impose new and increasingly restrictive burdens on providers concerning what constitutes a reasonable collection effort. The Board finds that these changes constitute new substantive changes that must be promulgated in accordance with the Administrative Procedure Act, 5 U.S.C. § 553 et. seq., that is, by regulation with notice and opportunity for comment.

*University Hospital v. Blue Cross Blue Shield Assoc.,* Medicare and Medicaid Guide (CCH) ¶ 43,482 at p. 45,222 (1995). *See also, Mt. Sinai Hospital and Medical Center v. Blue Cross and Blue Shield Association,* Medicare and Medicaid Guide (CCH) ¶ 43,594 at p. 45,851 (1995). The test developed by the Board is whether the provider demonstrated a valid reason, based on sound business judgment, for its decision not to refer Medicare accounts to a collection agency. *Bradford County Hospital v. Blue Cross and Blue Shield,* PRRB Dec. No. 92–D72, Sept. 30, 1992, Medicare and Medicaid Guide (CCH) ¶ 40,842.

█ In this case, the Hospital demonstrated valid justifications for its treatment of Medicare accounts, i.e., the negligible likelihood of recovery from referral of Medicare accounts to a collection agency. The Board has accepted this rationale in numerous cases. *See, e.g., Mt. Sinai,* Medicare and Medicaid Guide (CCH) ¶ 43,594; *University Hospital,* Medicare and Medicaid Guide (CCH) ¶ 43,482. For example, in *Mt. Sinai* the Board found a collection rate of 5.7% to be negligible. Thus, if one considers the amount the Hospital would have received by

---

1. Since its inception in 1968, § 310 of the PRM has required a hospital to refer Medicare accounts for outside collection if it does so for non-Medicare accounts. Section 310 was in effect on August 1, 1987.

sending the debt to collection to be negligible, the failure to send the debt to a collection agency does not automatically mean that the Hospital did not engage in reasonable collection efforts.

Plaintiff states that its collection efforts were reasonable because it was not appropriate to refer its Medicare accounts to a collection agency when it conducted its own internal collection efforts and when very little additional payment would result from referring such bad debt to a collection agency. For the period of May through December of 1995, the collection rate from Medicare beneficiaries by a collection agency was approximately 2.6%. In addition, Plaintiff states that further collection attempts would harass the elderly and dissuade them from seeking needed medical treatment, in contradiction of the Hospital's mission statement. According to Plaintiff, Plaintiff offered to accept a reduction in Medicare bad debt reimbursement of 5%, based on the historical percentage rate of non-Medicare collection by collection agencies, but this offer was rejected. Plaintiff further claims Defendant's action was based on a non-binding guideline in the PRM which arbitrarily sets forth the requirement that if non-Medicare bad debt is sent to a collection agency, then Medicare bad debt should also be sent to a collection agency.

Defendant argues that Plaintiff's efforts to collect the Medicare bad debt were unreasonable based on the fact Plaintiff submitted non-Medicare bad debt to a collection agency and did not submit Medicare bad debt to a collection agency, contrary to Plaintiff's own policy regarding collection of bad debt for both non-Medicare bad debt and Medicare bad debt. Moreover, the data from which Plaintiff calculated the 2.6% collection rate indicates that in May of 1995, no recoveries were made but in November and December of 1995, the collection rate rose to 4.9% and 4.7% respectively. In addition, Defendant claims the disallowance of the Medicare reimbursement was not arbitrary, capricious, or inconsistent with Medicare regulation and is supported by the evidence in the record. Defendant states that even though the Medicare PRM is not a regulation, that does not mean that it is not entitled to deference.

Defendant is correct in its assertion that, although the PRM is not binding law, it constitutes HCFA's interpretation of the regulation. This Court, bound by the applicable standard of review, must give "substantial deference to an agency's interpretation of its own regulations." *Jefferson,* 512 U.S. at 512 (1994) (cites omitted). The PRM basically reflects the view that a good way of measuring the reasonableness of a hospital's efforts to collect Medicare accounts is to compare them to what the hospital does when its own money, rather than the government's, is at stake. The Court cannot say that this barometer of reasonableness, which ensures that providers will diligently pursue the collection of the Medicare bad debt before turning to the Government for reimbursement, is "plainly erroneous or inconsistent with the regulation." *Jefferson,* 512 U.S. at 512.

Plaintiff argues that the Administrator's interpretation of the statute is unjust because of its extreme result. The Hospital claimed approximately $944,000 of bad debt, $722,000 of which was disallowed. If the Hospital had referred the disallowed amount to a collection agency, they would have recovered 5% ($36,000), at the very most, and the remainder from the Government. But, rather than refuse simply to pay them the $36,-000, the HCFA Administrator disallowed the entire $722,000, i.e., he disallowed the entirety of the Medicare bad debt without regard to the potential recovery rate if the debt had been referred to a collection agency.

Plaintiff claims that the imposition of a requirement that 100% of payment be forfeited because it did not engage in an exercise resulting in a negligible 5% recovery is a patently unreasonable interpretation of the regulation, which this Court has the authority to overturn. Plaintiff claims that a reasonable interpretation of the controlling regulation would be to reduce the Medicare bad debt claim to the extent that referral to a collection agency would have yielded payment (in this case 5%), and Plaintiff proposed this reduction during the audit, but was rejected.

Although Plaintiff's argument has some superficial appeal, it is not supported by the

plain language of the regulation or the policy behind it. The regulation provides no middle-ground for recovery of a portion of the bad debt if the provider engages in some collection effort which does not rise to the level enunciated in the regulations. Under the regulations, in order to qualify as allowable bad debt the provider must engage in reasonable collection efforts—if the provider does not engage in reasonable collection efforts, no portion of the amount is recoverable. Therefore, while several PRRB decisions have ruled that hospital collection procedures such as those at bar were reasonable, the Court cannot say that HCFA's interpretation to the contrary is patently unreasonable.

Furthermore, HCFA's interpretation is well-grounded in sound public policy because it tells providers that the Government will reimburse their Medicare bad debt, but only if they make a diligent effort to collect it first. A diligent effort, or "reasonable collection effort," according HCFA's interpretation of the regulation, entails treating Medicare bad debt the same way the hospital treats its own unreimbursable, non-Medicare bad debt. If a hospital fails to use reasonable collection efforts for the recovery of their Medicare bad debt by pursuing it as diligently as it pursues its own bad debt, it will not be reimbursed at all. This "all-or-nothing" approach is clearly designed to encourage the diligent collection of Medicare bad debt by hospitals before the taxpayers are asked to pay the costs. Although this policy may at times yield harsh results, it strikes the Court that since HCFA really stands in the shoes of the taxpayers with respect to reimbursing hospitals, it is not an unreasonable policy to require hospitals to exhaust every available avenue to collect Medicare bad debt before the taxpayers are required to reimburse them.[2] And, asking hospitals to treat taxpayer subsidized bad debt the same as they treat their own is certainly not unreasonable. Indeed, it seems a perfectly sensible and responsible policy.

Therefore, because the Hospital failed to make "a reasonable collection effort" to recover its Medicare bad debt, as that phrase is interpreted by the PRM, the Court affirms HCFA's reversal of the PRRB, and its decision to disallow reimbursement of the unreferred Medicare bad debt.

## B. BAD DEBT MORATORIUM

The Hospital also claims that even it failed to engage in reasonable collection efforts to recover its Medicare bad debt, a Congressional moratorium prevents HCFA from enforcing the policy because the Intermediary accepted and ratified its collection policy by reimbursing the Hospital for several years.

### 1. Historical Background

Prior to August 1, 1987, the Secretary, after audit, consistently paid the Medicare bad debt claims of hospitals. Subsequent to that date, widespread disallowances of Medicare bad debts that historically had been allowed occurred in response to a review of bad debts conducted by the HHS Office of Inspector General ("OIG"), in which the OIG conducted a national audit of intermediaries and hospitals to assess whether intermediaries were appropriately auditing providers' bad debt claims.[3]

In response to the bad debt disallowances, Congress expressly prohibited the Secretary and intermediaries from making changes in Medicare bad debt reimbursement policies

---

**2.** Although the amount realized from such additional collection efforts may be a comparatively small percentage of each hospital's referred debt—perhaps only 4% or 5%—when these efforts are aggregated across the entire Medicare program, the savings to taxpayers is substantial.

**3.** In 1986, the inspector general of Health and Human Services had proposed either eliminating bad debt reimbursement entirely or attempting to recoup the costs by garnishing the Social Security checks of debtors. Proposal Would Tap Social Security Payments, New York Times, December 3, 1986 at A24; HHS Inspector General Urges Deducting Unpaid Bills from Social Security Checks, 13 BNA Pension & Benefits Reporter 49, at 2037 (December 8, 1986). Neither proposal was adopted. The inspector general then called for much closer examination of providers' bad debt requests. See HHS Inspector General Continues to Recommend Scrapping or Revamping Bad–Debt Reimbursement, Modern Healthcare, June 17, 1991, at 50. *Hennepin County Medical Center v. Shalala*, 81 F.3d 743, 747 (8th Cir.1996).

that were in effect on August 1, 1987 in three separate amendments to the Omnibus Budget Reconciliation Act ("OBRA"). *Hennepin,* 81 F.3d at 747 (setting out the amendments *in seriatim*). This is commonly known as the bad debt moratorium.

As enacted by the first amendment, section 4008(c) read:

CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL SERVICES. In making payments to hospitals under title XVIII of the Social Security Act, the Secretary of Health and Human Services shall not make any change in the policies in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred after such title (including criteria for what constitutes a reasonable collection effort).

Pub.L. No. 100–203, § 4008(c), 101 Stat. 1330–55, 42 U.S.C. § 1395f note. Even after the enactment of this amendment, fiscal intermediaries continued to disallow bad debts that previously had been allowed. In response, Congress amended section 4008(c) in 1988 to emphasize that the "policy" that is to remain unchanged includes "criteria for indigence determination procedures, for record keeping, *and for determining whether to refer a claim to an external collection agency.*" (Emphasis added). Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, § 8402, 102 Stat. 3798, 42 U.S.C. 1395f note.

Despite the enactment of section 4008(c) and the 1988 revisions thereto, Congress felt compelled to address the issue again in 1989. Accordingly, the third amendment added the following language:

The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on

the basis of an expectation of a change in the hospital's collection policy.

OBRA of 1989, Pub.L. No. 101–239, § 6023, 103 Stat. 2167, 42 U.S.C. § 1395f note.

The final, codified version of 4008(c) now reads:

CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL SERVICES: In making payments to hospitals under title VII of the Social Security Act [this subchapter], *the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987,* with respect to payment under title XVIII of the Social Security Act [this subchapter] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title *(including criteria for what constitutes a reasonable collection effort,* including criteria for indigency determination procedures, for record keeping, *and for determining whether to refer a claim to an external collection agency).*

The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, *in accordance with the rules in effect as of August 1, 1987,* with respect to criteria for indigency determination procedures, record keeping, and *determining whether to refer a claim to an external collection agency, has accepted* such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

42 U.S.C. § 1395f note (emphasis added).

### 2. *Analysis*

The moratorium has two elements. First, the intermediary must have "accepted" the hospital's bad debt collection policy. Second, the acceptance must have been "in accordance with" the bad debt reimbursement rules in effect on August 1, 1987.

Here, the Hospital claims that the bad debt moratorium requires that the Administrator not disallow Medicare bad debt claimed consistent with provider's collection practices established before August 1, 1987,

and accepted by the Intermediary. The Hospital further claims that it has been its practice since it began operations in 1980— and therefore prior to August 1, 1987—to refer only its non-Medicare bad debt to a collection agency, and that this practice was accepted by the Intermediary and was not a legitimate basis for the Intermediary's adjustments to the amount of reimbursable bad debt, based on the fact that the Hospital received payment for the bad debt each year since 1980.

In response, HCFA argues that the "acceptance" by the Intermediary must be explicit, and occurs only to the extent such procedures were consistent with Medicare regulations, PRRB decisions, or program manuals and issuances.

Because the OBRA moratorium prohibits the Secretary from requiring a hospital to change its bad debt collection policy if the fiscal intermediary "accepted" the policy before August 1, 1987, the first level of inquiry must focus on the question of what constitutes "acceptance" of the "bad debt collection policy" of a hospital by a fiscal intermediary. The inquiry then moves to the question of whether the policy "accepted" by the intermediary was "in accordance with" the rules in effect at the time.

In *Harris County Hospital v. Shalala*, 64 F.3d 220 (5th Cir.1995), the intermediary disallowed the hospital's bad debt claim, based on the intermediary's determination that the hospital had not complied with all of the requirements of Medicare in properly verifying the indigency of patients and failing to consider assets in determining indigency. The hospital appealed the intermediary's decision to the PRRB. The PRRB held in favor of the hospital, but this decision was reversed by the Administrator.

On appeal, the Secretary claimed, as she claims here, that the term "accepted" required explicit acceptance of the hospital's policy. In rejecting this contention and holding that the fiscal intermediary had accepted the hospital's bad debt collection policies prior to August 1, 1987, the court stated:

> The term 'acceptance' is not defined and the statute includes no specific requirements for acceptance. We hold that [the fiscal intermediary's] previous payment of the Hospital's claim for reimbursement of bad debts after investigation and audit constitutes acceptance under the OBRA. Since this acceptance occurred before August 1, 1987, the Secretary cannot now attempt to force the Hospital to change its policies by disallowing its claim for reimbursement.

*Harris,* 64 F.3d at 222. In so ruling, the court noted the hospital's argument "that there is no method of formal acceptance provided by Medicare legislation or regulation." *Id.* at 222.

With regard to the second prong of the moratorium, the court rejected the Secretary's contention that even if the intermediary accepted the hospital's policies, that acceptance cannot excuse violations of the applicable guidelines and regulations, i.e., the moratorium only protects the provider if its policies were in accordance with the applicable rules and regulations governing Medicare bad debt collection. The court responded:

> That interpretation of the OBRA, however, is inconsistent with its language. The clear intent of Congress was to prevent the HHS from forcing hospital-providers to change their policies regarding indigency determinations by withholding reimbursement for bad debts.

*Id.* at 223 n. 11. The court ruled, therefore, that it "need not address the issue of whether the Hospital complied with all Medicare regulations because violation of the OBRA provides a sufficient basis for affirming the district court's judgment in favor of the Hospital." *Id.* at 222–23.

The Eighth Circuit appears to have rejected this view in *Hennepin County Medical Center v. Shalala*, 81 F.3d 743, 749–752 (8th Cir.1996). In *Hennepin*, the business manager of the provider hospital assured an intermediary auditor that the hospital used the same collection efforts for Medicare and non-Medicare debt. In 1984, just one year later, however, the business manager told the auditor that it did not pursue Medicare bad debts as vigorously as non-Medicare debts, and that these accounts were not turned over to

collection agencies. The intermediary then decided to reopen its reimbursement recommendation for 1983. The central issue in the case was whether the OBRA moratorium barred the reopening of the 1983 cost year.

The court examined the view that the issuance of an NPR constituted acceptance:

> A notice of program reimbursement, and the reimbursement that flows from it, are the only tangible forms of acceptance a provider can expect from an intermediary. As HCMC points out, there is no other mechanism through which a provider can submit a given policy and receive formal approval by the Secretary or intermediary. In the majority of cases, the notice of program reimbursement is the final consideration of a policy by an intermediary.
> . . .
> A reimbursement notice will not always be equivalent to an acceptance, however. . . .
> If the issuance of a notice of program reimbursement were invariably acceptance, as [the hospital argues] and the district court decided, the reopening regulation and others issued before August 1, 1987 would be superfluous. . . .
> In this case, it seems that two factors—the thoroughness of the audit of the 1983 cost year, and the alleged new and material information—may be particularly relevant in determining whether the intermediary accepted [the hospital's] policies.

*Id.* at 749–50. The court remanded the case to the district court, which had summarily ruled in favor of the hospital based on the issuance of an NPR, to determine whether the reopening was justified and in compliance with the moratorium under these circumstances. In remanding the case, the court specifically noted that its decision did not necessarily conflict with the Fifth Circuit's decision in *Harris*:

> There the issuance of the notice of program reimbursement was said to be an acceptance "after an investigation and audit." [*Harris*, 64 F.3d] at 222. It is unclear from the opinion whether the audit

thoroughly explored the issue at question. There was also apparently no new information available to the intermediary or the Secretary to suggest that reopening was warranted. On remand, the district court may find that this case is factually distinguishable. In any event, we do not read *Harris County* to hold that any audit and investigation is necessarily sufficient to make a notice of program reimbursement acceptance.

*Id.* at 750 n. 4.

Ultimately, the court held that the mere issuance of an NPR that allows bad debt costs does not necessarily constitute an acceptance of the hospital's bad debt collection policy for the purposes of the moratorium, because the intermediary may not have specifically reviewed or been made aware of all of the provider's practices.[4]

With regard to the issue of whether the hospital's policies had to be in accordance with the rules in effect at the time, the court rejected the hospital's argument that such a requirement would render the moratorium meaningless.

> Requiring that a provider's policies were in accord with the rules existing in 1987 does not render the moratorium meaningless. It leaves intermediaries, the PRRB, HCFA, and the Secretary free to correct improper applications of the rules as they existed and as they were interpreted on August 1, 1987. It prevents those entities from retroactively applying new rules or new interpretations of existing rules, however.

*Id.* at 751. This led the court to conclude that "Congress intended the moratorium to apply only where a provider was in compliance with rules existing on August 1, 1987, as embodied by the regulations, the PRM, and PRRB decisions." *Id.* at 751.

### *(a) "Acceptance"*

▮ Taken together, *Harris* and *Hennepin* can be read to form the following test:

---

**4.** *See also, University Health Services, Inc. v. Shalala,* 120 F.3d 1145, 1149 (11th Cir.1997) (adopting the *Hennepin* Court's rationale in a case in which the intermediary discovered new, material

information previously unavailable that informed its decision to disallow certain claims not in conformity with governing Medicare rules and policies).

The issuance of an NPR raises a presumption that the intermediary knew of, and accepted, the hospital's policies, i.e., in most cases, the issuance of an NPR will be dispositive evidence of acceptance; however, the intermediary can rebut this presumption by presenting evidence that they had not specifically reviewed the hospital's policies, or, more likely, that the intermediary discovered new, material evidence previously unavailable to it.[5]

 In this case, the Intermediary issued an NPR for the year in question, and, thus, presumably reviewed the Hospital's procedures. The Court construes the NPR as prima facie evidence that the Intermediary knew of, and accepted, the Hospital's policy of not referring Medicare bad debt to a collection agency. However, Defendant notes that the Hospital's written policy was to refer all bad debts to collection, and, therefore, that the Hospital was acting in contravention of its own written policy. This leads Defendant to contend, "Thus, even *if* the intermediary had reviewed the hospital's bad debt policies prior to the issuance of NPRs, it *may* not have been clear from the written documents that the hospital was treating Medicare and non-Medicare accounts differently." (Emphasis added). Defendant presents this argument hypothetically, discussing what it might have known, rather than what it did know. Defendant's hypothetical, which merely shows that deceit may have been possible, not that it actually occurred, is insufficient to rebut the presumption of acceptance established by the NPR. Therefore, considering the absence of evidence establishing deceit or fraud, and the absence of evidence establishing that the Intermediary found new, material evidence that could lead it to reevaluate the Hospital's

policies, the Court rules that the Intermediary did accept the Hospital's procedures.

### (b) "in accordance with"

On the face of the statutory language itself, the moratorium includes two restrictions upon the Secretary. First, it prohibits the Secretary from making "any change in the policy in effect on August 1, 1987, with respect to payment under [Medicare] to providers of service for reasonable costs relating to unrecovered costs ... (including criteria for what constitutes a reasonable collection effort), [and] including criteria for ... determining whether to refer a claim to an external collection agency." 42 U.S.C.A. § 1395f note. Second, the moratorium prohibits the Secretary from requiring a hospital to change its bad debt collection policy "if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to the criteria for ... determining whether to refer a claim to an external collection agency, had accepted such policy before that date[.]" 42 U.S.C.A. § 1395f note.

Thus, the moratorium is aimed at accomplishing a freeze on the status quo ante as of August 1, 1987 on two levels: (1) the Secretary may not change her policies regulating the collection of Medicare bad debt and the definitions thereunder; and (2) the Secretary may not require a hospital to change its bad debt collection policies if these policies had been accepted by an intermediary and that intermediary's acceptance was in accordance with the rules in effect at that time.

 The Hospital, however, argues that the moratorium operates as an estoppel precluding HCFA from denying reimbursement on the basis that the hospital did not conform to the Secretary's bad debt collection rules if the intermediary had previously "accepted"

---

5. In post-hearing briefs, the parties argued over the extent of the Intermediary's knowledge which can be inferred from one of the stipulations of fact. The stipulation reads:

> 9. The Provider's bad debt collection policy for the 1991 cost reporting period is identical to the Provider's bad debt collection policy in effect as of August 1, 1987, i.e., the Provider referred non-Medicare bad debt to a collection agency but did not refer Medicare bad debt to a collection agency.

The Hospital claims that the stipulation constitutes an agreement that the Intermediary knew that as of August 1, 1987, the Hospital "referred non-Medicare bad debts to a collection agency but did not refer Medicare bad debt to a collection agency." The Intermediary interpreted the stipulation as a recognition that, *in retrospect*, it agreed that the policy was the same in 1991 as it was in 1987. Under the burden shifting analysis employed by the Court here the resolution of this issue is unnecessary.

the hospital's bad debt collection policy. HCFA's position is to the contrary, i.e., that the moratorium only prevents the Secretary from enacting and retroactively applying new regulations, and therefore does not disallow the enforcement of existing rules, even if the intermediary had previously failed to enforce them. The resolution of this dispute requires a grammatical interpretation of the statute, as well as an examination of the legislative history behind the moratorium.

The Hospital submits that the phrase "in accordance with the rules in effect on August 1, 1987" modifies "accepted" and not "policy." Plaintiff's Brief, p. 37; *Harris County,* 863 F.Supp. at 408–09. The import of this grammatical interpretation, according to the Hospital, is that the phrase applies only to the Intermediary's acceptance of the Hospital's policy in accordance with the applicable cost report auditing rules, not to the regulations concerning reasonable bad debt collection efforts.

While it is true that the phrase modifies "accepted," it does not necessarily follow that the amendment does not implicate and invoke the Secretary's substantive bad debt collection rules. Those rules are incorporated into the amendment by the appositive "with respect to criteria for ... determining whether to refer a claim to an external collection agency." As the court noted in *Hennepin* with respect to the Hospital's interpretation:

> This reading, which was also adopted by the district court in *Harris County,* is inconsistent with the clause "with respect to the criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency." If Congress had meant only to require that the intermediary had followed the procedural rules governing program reimbursement, the word "criteria" would be unnecessary. The only reasonable interpretation of "criteria" in this instance refers to those criteria set out in the Act, rules, regulations, and PRRB de-

cisions that apply to providers. Whether an intermediary correctly applied those criteria necessarily invokes the substance of the provider's policies to which the criteria were applied.

*Hennepin,* 81 F.3d at 750. That appositive necessarily implicates the Secretary's rules concerning bad debt collection efforts, including those established by the PRM, as it is those rules which establish the "criteria" for determining the necessity of referring bad debt. Thus, the Hospital's interpretation of the moratorium is unacceptable because it fails to give meaning to the appositive which clearly incorporates the substantive rules governing bad debt collection efforts.

■ The Hospital claims that even if the moratorium does incorporate the Secretary's substantive "rules" governing bad debt collection, the word "rules" is a synonym for regulations, and does not include the PRM, which represents the Secretary's interpretation of those regulations.[6] However, this interpretation is simply not reflected in the language of the moratorium itself, which refers to the "criteria" for determining the appropriateness of referring a claim to external collection, and is not specifically limited to the regulations. This clearly indicates an intent by Congress to incorporate not merely the regulations, but, presumably, the Secretary's interpretation of the regulations as well.

This view of the moratorium is reflected in the Congressional history as well. The Senate Conference Agreement on the 1988 Amendment expressed the conferees' concern with the HHS Inspector General's recommendations regarding bad debt collection policies for hospitals, and the Senate's perception that some of the recommendations appeared "to create requirements *in addition to those in the* Secretary's regulations, the decisions of the Provider Reimbursement Review Board, and *relevant program manual* and issuances." H.R.Conf.Rep., 100–1104, 100th Cong., 2d Sess. 277 (1988), 1988 U.S.C.C.A.N. 5048, 5337 (emphasis added).

---

6. Here, it is important to recall that it is the interpretation in the PRM of the regulation's phrase "reasonable collection efforts" that requires a hospital refer its Medicare bad debt to a collection agency, if it refers its non-Medicare bad debt, in order to be deemed a "reasonable collection effort."

Congress feared that the implementation of such regulations would "have the effect of violating the prohibition on changes in policy if the Secretary's response results in the retroactive disallowance of bad debt payments claimed by hospitals." *Id.* Congress concluded by clarifying:

The conferees wish to clarify that the Congress intended that the actions of the fiscal intermediaries occurring prior to August 1, 1987 to approve explicitly [a] hospital's bad debt collection practices, *to the extent such action by the fiscal intermediary was consistent with the regulations, PRRB decisions, or program manuals and issuances,* are to be considered an integral part of the policy in effect on that date, and thus not subject to change.

*However, the conferees do not intend to preclude the Secretary from disallowing bad debt payments based on regulations, PRRB decisions, manuals, and issuance [sic] is in effect prior to August 1, 1987.*

*Id.* (emphasis added).

■■■ The legislative history of the Act confirms Congress' intention to allow acceptance of a hospital's policy only to the extent that such action was consistent with the regulations, and the interpretation of those regulations as included in the PRM. The moratorium does not prevent the Secretary from properly enforcing the rules as written, but merely from re-writing or interpreting the rules more harshly, and retroactively applying them. "It appears Congress merely sought to freeze a moment in time, forbidding the Secretary to change the criteria after that date, but allowing full enforcement of the policies in place before it." *Hennepin,* 81 F.3d at 751. The Hospital does not contest that it was not in compliance with HCFA's criteria for bad debt collection and reimbursement which was in effect as of August 1, 1987. This is because the PRM then in effect required "reasonable collection efforts" and defined such efforts to include the requirement that if the hospital referred its non-Medicare bad debt to a collection agency, it was required to similarly refer its Medicare bad debt, which the Hospital here undisputedly did not do. Therefore, the Secretary's enforcement of the rules in the PRM

that were in effect as of August 1, 1987, was entirely proper.

The Hospital argues that the moratorium must have been passed to address situations such as those present in the instant case, because a contrary interpretation of the moratorium would render it meaningless. This argument goes too far as it misses the point of the moratorium. The moratorium does not tell the Secretary that if she or the intermediary made a mistake in enforcing the rules in effect in 1987 and reimbursed hospitals against those rules, she and the intermediary are stuck with that practice and could not subsequently enforce those rules. Rather, the moratorium freezes the rules then in effect by prohibiting the Secretary from either changing her policies, or requiring hospitals to change their policies, to make the reimbursement requirements *more stringent.* In other words, the moratorium prohibits the Secretary from "raising the bar" and implementing policies which would have made it more difficult to receive reimbursement than it was under then existing policies.

In this context, the usefulness of the moratorium, and how it operates as a practical matter, is made evident by HCFA Memorandum to Regional Administrators, HCFA Clarification on Bad Debt Policy, Medicare and Medicaid Guide (CCH) ¶ 38,623 (1990), promulgated after the moratorium was adopted by Congress. The memorandum clarified the point in the collection effort at which a provider may claim Medicare bad debt. Provider Reimbursement Manual § 310.2, Presumption of Noncollectability, provides that, "If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible[,]" thus entitling the provider to be reimbursed by the Government for this Medicare bad debt. Many providers had claimed the debt was uncollectible after 120 days, even if the account had been sent out to, and was still pending with, a collection agency, and intermediaries permitted an allowable bad debt in that situation. Subsequent to passage of the moratorium, HCFA informed the regional offices that a bad debt could not be claimed

while an account was at the collection agency, thereby prohibiting such a practice.

With this Memorandum, HCFA "reexamined" and reversed its position on the issue, considering the actual language of § 310.2 and the impact of the moratorium. HCFA stated that a provider could have reasonably interpreted § 310.2 to provide that an uncollectible account could be presumed to be a bad debt if the provider had made a reasonable and customary attempt to collect the bill for at least 120 days even though the claim had been referred to a collection agency. The Memorandum further stated:

> Such an interpretation is reasonable unless it is apparent that the debt is not a bad debt, for example, because the beneficiary is currently making payments on account, or had currently promised to pay the debt. As noted above, section 310.2 provides that the debt *may* be deemed uncollectible rather than that the debt "shall" or "must" be deemed collectible. On the contrary, "may" connotes the existence of discretion. Thus, even after 120 days, a debt should not be deemed uncollectible when there is reason to believe that in fact it is collectible. However, the mere fact that a debt is referred to a collection agency after the provider's in-house collection is completed does not mean that the debt is collectible.
>
> *Therefore, where an intermediary, in accordance with the preceding paragraph, applied section 310.2 to permit·an allowable Medicare bad debt for an account sent to a collection agency, consistent with the provider's procedures for non-Medicare patients, the moratorium would prohibit the intermediary from applying the policy differently despite HCFA directives to the contrary dated subsequent to August 1, 1987. Accordingly, where an intermediary at HCFA's direction later disallowed Medicare bad debts which it had originally allowed, the intermediary should reverse that disallowance.*

HCFA Memorandum to Regional Administrators, HCFA Clarification on Bad Debt Policy, Medicare and Medicaid Guide (CCH) ¶ 38,623 (1990) (emphasis added).

Thus, the Memorandum provides a prototypical illustration of how the moratorium

operates. Hospitals and intermediaries reasonably interpreted § 310.2 of the PRM to mean that hospitals could deem their Medicare bad debt uncollectible is they had attempted to collect·it for 120 days, even if it had been referred to a collection agency, and, thus, the moratorium prohibited "the intermediary from applying the policy differently despite HCFA directives to the contrary dated subsequent to August 1, 1987." That is, the moratorium prevented the Secretary from adopting a more stringent interpretation of the rule after August 1, 1987, because the hospitals' reasonable interpretation of the rule had been accepted by the intermediaries.

The circumstances illustrated by the Memorandum are clearly distinguishable from the instant case. Here, the Hospital acted in clear contravention of an unambiguous provision of the PRM, and the Intermediary also failed to act in conformity with the PRM by ratifying the Hospital's transgression and reimbursing the Hospital despite the fact that it did not use reasonable collection efforts as defined by the PRM. As the text of the moratorium and the accompanying legislative history make clear, the Secretary is not precluded from correcting this situation by disallowing reimbursement in accordance with the rules (i.e., the PRM) in effect as of August 1, 1987. The rules had not changed, or been interpreted any differently, but were simply being enforced properly.

### CONCLUSION

Therefore, the Court affirms HCFA's reversal of the PRRB because the Hospital did not undertake reasonable collection efforts to recover its Medicare·bad debt, HCFA properly disallowed reimbursement in the amount of $722,650. Furthermore, the Court finds that although the Intermediary accepted the Hospital's bad debt collection practices, that acceptance was not in accordance with the rules in effect as of August 1, 1987, and HCFA's refusal to reimburse the Hospital is not prohibited by the moratorium. Therefore,

IT IS HEREBY ORDERED Defendant's Motion for Summary Judgment is GRANT-

ED. The case is DISMISSED WITH
PREJUDICE.